John SUGGARS, Sr., Plaintiff in Error,

v.

STATE of Tennessee, Defendant in Error.

Court of Criminal Appeals of Tennessee.
July 16, 1974.

Certiorari Denied by Supreme Court
Feb. 10, 1975.

Hugh W. Stanton, Jr., Public Defender, Memphis, for plaintiff in error.

David M. Pack, Atty. Gen., Weldon B. White, Jr., Asst. Atty. Gen., Nashville, Jewett H. Miller and Don F. Young, Asst. Dist. Attys. Gen., Memphis, for defendant in error.

## OPINION

OLIVER, Judge.

Represented by the Shelby County Public Defender appointed by the court, the defendant was tried upon two first degree murder indictments simultaneously, one charging him with the murder of his wife and the other with the murder of her aunt. Convicted of first degree murder in both cases and sentenced to consecutive terms of life imprisonment in the penitentiary, the defendant has now duly brought his case to this Court by an appeal in the nature of a writ of error.

The first three Assignments of Error make the usual assault upon the sufficiency of the evidence to warrant and support the verdicts. The defendant neither testified nor presented any proof. Essentially, the material substance of the evidence shows that during a period of marital turmoil the defendant's wife Virginia was living with her 81-year-old aunt, Mary Bonds. The defendant's wife Virginia and Mrs. Bonds were found shot to death in the latter's

apartment about 7:30 p. m. on May 5, 1972, shortly after the defendant and his wife were seen in the apartment following their arrival there in an automobile and his departure moments after shots were heard. Police were called by the neighbor who found the bodies.

According to the defendant's confession, admitted in evidence and further referred to hereinafter, he picked his wife up at her place of employment on Graham Avenue where she was waiting for him and they drove to Mrs. Bonds' apartment; there she asked him for $20 which he gave to her, and she then refused to go home when he requested her to do so; he then pulled his .22 caliber revolver from his pocket and she tried to grab it and him and he shot her two or three times; "Then, Mary Bonds looked like she was going to hit me with something off the dresser, so I shot her"—twice; he then drove home and hid his gun in a shed at the rear of his house. He also said in his confession that the next day he signed a paper consenting to the search of his home and the shed in the rear, and that his statement made about an hour and a half earlier (denying killing the two women) was not true. He said that after he got home a niece, whose name he could not remember, called and told him something had happened to his wife and Mrs. Bonds. He told one of the police officers that he then returned to the scene.

One of the defendant's nieces, Dollie Mae Johnson, who lived in an apartment building in the same complex where Mrs. Bonds lived, testified that she went to the scene and while standing nearby observing the crowd and the police officers, the defendant approached her crying and said somebody had killed his wife, wondered who could have done it and said all he had was now gone and asked her to stand by him; that about 11:00 or 11:30 and again about 2:00 a. m. she called the defendant and asked him if he killed the women and he said he did not; and that on each of the latter occasions she also asked him if

he needed her and he replied, "No. All I need is God."

The defendant's insistence here is that these homicides were committed in the heat of blood and passion, that there is no evidence of cool, deliberate premeditation and malice aforethought, and that the record can only support convictions of second degree murder or voluntary manslaughter. In urging this contention the defendant would ignore unchangeable salient facts. He returned to the scene the same night and pretended to his niece, Dollie Mae Johnson, that he was innocent and grief stricken. When she later called him twice that night and asked him specifically if he had killed the women he denied it. That was Friday night. When she visited him in jail the following Sunday morning and asked him "Uncle John, why did you do that?", the defendant replied, "I did what I wanted to do and it's all over with now," and gave her money to employ a lawyer. That inculpatory statement was a confession of his deliberate purpose and premeditation.

It was ballistically determined that two bullets removed from his wife's body were fired from his revolver found in the shed behind his house.

Viewed in the light of the rules governing appellate review of the evidence in criminal cases when its sufficiency is challenged on appeal, Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, 1 Tenn.Cr.App. 1, 425 S.W.2d 799; Chadwick v. State, 1 Tenn.Cr.App. 72, 429 S.W.2d 135, manifestly the defendant has wholly failed to carry his burden of demonstrating here that the evidence preponderates against the verdicts and in favor of his innocence, assuming the trial court committed no prejudicial error in the admission or exclusion of evidence or otherwise, and we find no such error.

The Assignment complaining about admission of nine black and white

photographs showing the fully dressed bodies of the two women, made during the police investigation at the scene, is groundless. While it could be argued that the photographs were unnecessary in view of the defendant's confession admitting killing the two women, nevertheless it is unarguable that these photographs are relevant as explaining and corroborating the testimony of the investigating officers, including the one who made the photographs, concerning the location and position of the bodies and the obviously point-blank range from which the shots were fired into the chest of the defendant's wife, and those of her aged aunt, with her undergarments down around her ankles, indicate the implausibility of his story that she was about to attack him. The trial judge did not abuse his discretion in admitting the photographs. Briggs v. State, Tenn.Cr.App., 501 S.W.2d 831; Collins v. State, Tenn.Cr.App., 506 S.W.2d 179; Cagle v. State, Tenn.Cr.App., 507 S.W.2d 121.

■ The defendant's statement made Sunday at the jail to a private individual, his niece, was admissible and his Assignment that it was error to admit her testimony about his statement is unmaintainable. Freshwater v. State, 2 Tenn.Crim. App. 314, 453 S.W.2d 446.

■ When Police Lieutenant Jordan saw the defendant at the scene he was crying and appeared greatly disturbed about the death of his wife. His Assignment attacking that testimony, based upon the officer's observation, is meritless. West v. State, 221 Tenn. 178, 186, 425 S. W.2d 602.

■ The same officer talked with the defendant at the scene, along with 50 or 60 other people, in the course of the preliminary investigation, without explaining to him or any of the others their constitutional rights. The defendant answered negatively when asked if he had any idea who might be responsible for this crime and whether he had been involved in any trouble with anyone. After stating that he and his wife were legally married, he was asked and gave his written consent for an autopsy. The law is settled that general on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact finding process, when the investigation has not progressed beyond general inquiry, is not forbidden and statements made in those circumstances are admissible. Tate v. State, 219 Tenn. 698, 413 S.W.2d 366; State v. Morris, 224 Tenn. 437, 456 S.W.2d 840; Gordon v. State, Tenn.Cr.App., 478 S.W.2d 911; Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. So, there is no merit in the Assignment complaining his constitutional rights were not explained to the defendant at that time. He was not in custody, and asking if they were married and for his consent for an autopsy upon his wife's body was not accusatory.

■ There is nothing to the Assignment that the court erred in sustaining the State's objection and not permitting Police Lieutenant Jordan to answer defense counsel's question as to whether the husband is the most likely suspect in any wife killing.

■ Also baseless is the complaint about admission of Police Lieutenant King's testimony concerning a statement made by the defendant on Saturday morning without a *Miranda* explanation of his rights. In an effort to find the address of Virginia Suggars' employer, police lieutenants King and Marshall returned Saturday morning to Mary Bonds' apartment and found a telephone number written on an envelope. Thinking it might be her employer's phone number, Lieutenant Marshall called that number. It was the defendant's number and he answered. He could not tell the officers the address where his wife was employed as a private duty nurse, but said he could take the officers there and did so after they went to his residence. During the trip Lieutenant King asked the defendant if he had any idea who might have killed his wife and her

aunt. The defendant said that his son had told him some boys around the neighborhood saw a black car occupied by four Negro men stop in front of the apartment; that two of the men got out and went inside; that a short time later the boys heard some shots, which they thought were firecrackers, and saw the two men come out of the apartment and get into the automobile and drive away with the other two men who had remained in the car.

At Lieutenant King's request, the defendant accompanied them to police headquarters where, without being advised concerning his Fifth Amendment rights, he signed a written statement containing his answers to Lieutenant King's questions. He was not in custody or under arrest at the time. Instead, the general investigation was continuing. Although King and Marshall had heard when they returned to the scene early that morning that he had been there the night before about the time the crime was committed, and did not believe he was telling them the truth, they did not tell him about that information because nobody had been ruled out as a suspect at that time. He reiterated the above-noted story about what his son had told him. He also said that he did not know his wife and her aunt had been killed until a niece, whose name he could not remember, came to his house and told him about it; that he and his wife had never been separated nor had any family problems; that his wife had spent the night with her aunt every night since "last Monday a week ago" to look after her and give her her medicine because Mrs. Bonds had called and said someone tried to break into her house; that his wife called him every morning and every night, and it was okay with him when she called Friday evening before she left work and said she was going back to her aunt's; that the last time he saw his wife was when she was starting to catch the bus that morning on her way to work; that he did not own a pistol and only had a .410 gauge shotgun which was broken during the last rabbit season. He told Lieutenant King he could not read but

could write his name. This wholly exculpatory statement was filed as an exhibit and was also read into the record both in the absence of and in the presence of the jury after the trial judge overruled the defendant's objection, based upon the failure to advise him of his constitutional rights as required by *Miranda*, supra.

"The trial courts will be allowed a wide latitude of discretion in applying the rules set out above, and unless it appears that such discretion has been abused and the defendant's rights infringed upon, then the appellate courts will not intervene, for this is a question of fact to be decided by the trial court." State v. Morris, supra. Upon this record we cannot say the trial judge erred in admitting the defendant's first exculpatory statement and the testimony about it, and the Assignments raising that question are not sustainable.

The next insistence, that the defendant's inculpatory second statement or confession was inadmissible, also represents a misconception and must be rejected. While the defendant was still at police headquarters his first written statement was reviewed by police lieutenants King and Marshall and Police Detective Lewis. Marshall then told the defendant, "You're not telling us the truth and you're going to have to get it straight," and then he was placed under arrest by Detective Lewis who fully advised him concerning his constitutional rights which he said he understood, and that he was willing to talk further about the case, and proceeded to make and sign the full confession summarized early in this opinion. It was filed as an exhibit and was read into the record before the jury after defense objections were overruled. The defendant's contention that his confession was the fruit of his earlier exculpatory statement and was tainted by it is simply not supported by this record.

Also untenable are the Assignments complaining about admitting in evidence, over defense objection, the consent to search signed by the defendant and his

pistol found in the subsequent search of the tin shed at the rear of his home. He labors under a misapprehension in contending that the consent to search and the search were illegal because he could not read and both were the fruit of his illegal confession. As we have noted, his confession, which he initialed upon every page and signed, was not infected with any constitutional infirmity and was properly admitted. In it he related that he hid the gun in the shed at the rear of his house and freely and voluntarily consented to the search.

Affirmed.

MITCHELL, J., concurs.

GALBREATH, Judge (dissenting).

I dissent. The record is wholly without proof that would show premeditation. All murders are presumed by law to be in the second degree and it is incumbent upon the parties to proof that the homicide was of a higher or lower degree. See Witt v. State, 46 Tenn. 5. The fact that the defendant denied his guilt proves nothing. It is not inconsistent with human nature that a person who has accidently killed another under circumstances that would constitute involuntary manslaughter, or indeed nonculpable homicide, might seek to evade detection as the killer. So the fact that he denied complicity proves nothing except that he wanted to escape the consequences, in so far as possible, of his rash act. The state of mind at the time of the killing is the key factor.

> "The mental state of the assailant at the moment, rather than the length of time the act may have been premeditated, is the material point to be considered. The mental process, in the formation of the purpose to kill, may have been instantaneous, and the question of vital importance is—was the mind, at that moment, so far free from the influence of excitement, or passion, as to be capable of reflecting and acting with a sufficient de-

gree of coolness and deliberation of purpose; and was death of the person assaulted, the object sought to be accomplished—the end determined upon."

Lewis v. State, 40 Tenn. 127

Also the fact that the defendant admitted that he did what he wanted to do says nothing to dispell the presumption of law the majority opinion would ignore. Second degree murder is a wilfull act. It is something the killer wants to do. However the law presumes that the intent to kill was not preconceived, coolly and deliberately formed. The law presumes under facts such as are in this record that the killer, in an emotional state in which his better judgment is overcome by passion and anger, lashes out and kills—not for profit; not for revenge; not because of hatred; but, incongruously, because of regard, affection and love for the object of his wrath. It is no psychological happenstance that most murderers kill those whom society would suppose would be most protected by the killer. Thus wives kill their husbands more often than they kill lovers. Husbands kill their wives more frequently than girlfriends. Many sons and daughters are killed by their parents and vice versa. Close friends, relatives, and neighbors are more apt to kill one another than strangers. This is because of the emotional ties between victim and murderer. It is this link that makes the average second degree murder so easy to solve. If a wife is found killed, the husband is the logical suspect, etc.

Contrast this with first degree murder, the classical example of which is that accomplished by a professional, hired killer. There is no emotional factor involved. More often than not the assassin resides in a different part of the country and has never heard of the victim until he is employed to kill him. This murderer, for which the law reserves the highest penalty, is seldom caught. It is well known that not one conviction for a so called "gangland murder" has ever been obtained in Chicago, al-

though more than a thousand have occurred since prohibition days in that city.[1]

I cannot agree that there was any justification whatsoever in showing to the jury the gruesome pictures that were probative of nothing material to this lawsuit that was not competently proved by other, less lurid means. The use of such photographs should not be condoned where it appears they are likely to unduly prejudice a jury. Jenkin v. Associated Transport, Inc. 330 F.2d 706 (6th Cir. 1964).

I would reduce the degree of murder to that the law presumed it to be and modify the judgment in accordance with the procedure approved by the Supreme Court in Forsha v. State, 183 Tenn. 604, 194 S.W.2d 463.

1. Federal Bureau of Investigation—Homicide Statistics.