Case 12.—PROSECUTION AGAINST ARTHUR WESTRUP FOR INVOLUNTARY MANSLAUGHTER.—May 30.

## Westrup v. Commonwealth.

Appeal from Campbell Circuit Court.

A. S. BERRY, Circuit Judge.

Defendant convicted and appeals.    Reversed.

1. Involuntary Manslaughter   Neglect of Wife by Husband—Death of Wife—Where a husband neglects to provide necessaries for his wife, or medical attention in case of her illness, he will be guilty of involuntary manslaughter, provided it appear that she was in a helpless state and unable to appeal elsewhere for aid, and that her death, though not intended nor anticipated by him, was the natural and reasonable consequence of his negligence.
2. Criminal Intent—A Criminal intent is not necessary to conviction of one for involuntary manslaughter.
3. Same—Childbirth—Aversion of Wife to Physicians—Refusal to Employ Them—Attention of Husband—Unsupported Verdict In a prosecution against a husband for involuntary manslaughter in neglecting to provide medical assistance for his wife in a case of childbirth, where the evidence shows that he is a kind and affectionate husband; that his wife had an aversion to physicians and refused to employ them, and had persuaded her husband to believe that their services were not necessary in diseases or in cases of childbirth, and that she had a woman in the house to wait on her, and that when suffering after the birth of her child he sent for a reputable physician against her objection, who came and treated her, we fail to find any just or reasonable ground for a verdict finding him guilty of involuntary manslaughter by reason of her death, and such verdict is set aside as wholly without support from the evidence.

R. W. NELSON and A. M. CALDWELL for appellant.

The grounds relied on for reversal are:

1. Error of the Court in overruling demurrer to the indictment.

2. In failing to sustain defendants motion to discharge him notwithstanding the verdict.

3. In failing to peremptorily instruct the jury to find defendant not guilty.

4. The court erred in instructing the jury.

5. The verdict is contrary to the law and evidence.

6. Error in admitting incompetent evidence for the commonwealth and refusing competent evidence offered by defendant.

7. Misconduct of commonwealth's attorney in closing argument to the jury.

### AUTHORITIES CITED.

A. E. Ency. of Law, Vol. 21, page 199; Montgomery v. Com. 26 Ky. L. R., 350; Conner v. Com., 76 Ky., 719; Buckner v. Com., 77 Ky., 601; Mitchell v. Com., 78 Ky., 219; Trimble v. Com., 78 Ky., 176; Bush v. Com., 78 Ky., 268; Bishop Crim. Law., Vol. 1, Sec. 314; Smith v. Com., 93 Ky., 318; 4 Blackstone, 192; Crim. Code, Sec. 122; Willson v. Com., 21 Ky. L. R., 1333; Rhodes v. Com., 21 Ky. L. R., 1070; Rhodes v. Com., 21 Ky. L. R., 1076.

W. A. BURKAMP, N. B. HAYS and C. H. MORRIS for appellee.
(No brief in the record.)

OPINION BY JUDGE SETTLE—Reversing.

The appellant was indicted by the grand jury of Campbell county and tried in the circuit court of that county for involuntary manslaughter, alleged to have been committed by willfully neglecting to furnish his wife, then pregnant and about to be delivered of a child, with such care and attention as were necessary during her confinement in childbirth, thereby causing her death. Upon the trial the jury found appellant guilty as charged and fixed his punishment at imprisonment in the county jail eight months, in conformity to which judgment was duly entered.

Waiving consideration of the objections made by appellant to the indictment, we will rest our decision of the case upon the second contention presented by the motion and grounds for a new trial, and now relied

on by appellant's counsel for a reversal, viz., that the
verdict was contrary to and not sustained by the evi-
dence.  "Involuntary manslaughter is the killing of
another person in doing some unlawful act not
amounting to a felony, nor likely to endanger life,
but without an intention to kill, or where one kills
another while doing a lawful act in an unlawful man-
ner."  Robinson's Ky. Crim. Law. sec. 198; Connor
v. Com., 13 Bush, 718; Trimble v. Com., 78 Ky. 177;
York v. Com. 82 Ky. 368, 6 Ky. L. R. 344. "Any per-
son neglecting to discharge a duty required of him,
either by law or contract, thereby causing the death of
another, is guilty of involuntary manslaughter. Thus,
if a parent or master neglects to supply food and
clothing or medical attendance to a child or appren-
tice whom he is under a legal obligation to maintain,
and the child or apprentice dies of the neglect, he is
guilty of involuntary manslaughter."  Robinson's
Ky. Crim. Law, § 204.  Where the husband neglects
to provide necessaries for his wife, or medical atten-
tion in case of her illness, he will be guilty of involun-
tary manslaughter, provided it appear that she was
in a helpless state and unable to appeal elsewhere for
aid, and that the death, though not intended nor an-
ticipated by him, was the natural and reasonable con-
sequence of his negligence.  Robinson's Ky. Crim.
Law, § 204; Wharton's Crim. Law, § 332.  A criminal
intent is not necessary in involuntary manslaughter;
and, there being no statutory punishment provided
for the offense, it is therefore punishable by fine or
imprisonment in jail, one or both, at the discretion of
the jury, which is the common-law punishment for
misdemeanors for which no punishment is provided by
statute.  After this brief statement of the law as to
involuntary manslaughter, it remains to be seen
whether, under the evidence appearing in the record,
appellant's conviction was authorized.

According to the evidence, appellant's wife, Flor-

ence Westrup, died February 27, 1905, about two hours after giving birth to a child. She and appellant were married in Chicago in the year 1900, but had been living in Newport but a few months before her death, and had formed very few acquaintances there. They were an affectionate couple, though both were reserved in disposition and positive in their beliefs. He is an artist, and previous to his wife's death was at work for the Donaldson Lithographing Company, earning $20 per week, and his wages, when received by him, were delivered to his wife for safe-keeping and use in their joint support. They were housekeeping in rented rooms of a house which was in part occupied by other renters, and the household work was done by the wife with such assistance as the husband could take time from his own work to give her. The evidence further showed that the wife became pregnant, and was of opinion that her child would be born the 4th of March, 1905; that she was a woman of unusual intelligence, and, though never before with child, had some peculiar ideas as to the care to be taken of herself during pregnancy and of the child after its birth, in which her husband seems to have shared; that she was a strong believer in the laws of nature, and read many books on that subject and medicine, among which was one called "Tokology," written by Dr. Stockham, a female physician, of Chicago, with whom she corresponded before the birth of her child; that as a result of her reading and correspondence with the female doctor appellant's wife conceived a great aversion to physicians, and contended that they were too ready to resort in cases of childbirth to the use of instruments, which often resulted in death or injury to both mother and child, and declared her purpose to do without the services of one at the birth of her child. Adhering to this view, she by letter requested a sister of her husband, living in another State, to be with her in her confine-

ment, naming March 4th as the date, and the sister promised to do so, and, without knowing of the illness of appellant's wife, did in fact reach Newport on the day of and a few hours after her death. It also appeared from the evidence that appellant's wife was seized with labor pains early in the morning of the day on which she died; but, as she had previously suffered what appeared to be similar pains, which soon passed away, she and appellant remained, until shortly before the birth of the child, in the belief that she would not be confined before March 4th, five days later than the one on which she died. But, contrary to their expectations, the birth of the child occurred between 1 and 3 o'clock p. m. of that day, February 27, 1906, and, though for a short while thereafter the mother seemed to be doing well, about 4 o'clock she became worse, alarmed at which appellant called in two women residing in the same house, and, upon being advised by one of them that a physician should be summoned, he immediately sent for one, who upon reaching the wife's bedside attempted to give her some medicine, which she refused to take. The doctor by appellant's direction, and notwithstanding the patient's objection, then made an examination of her person, and discovered that she had not been relieved of the afterbirth, which he attempted to remove; but finding that it could not be done without his instruments, he went to his office for them, and upon his return to appellant's residence found that the patient had died during his absence of postpartum hemorrhage, which, according to the testimony of the medical expert introduced in behalf of the Commonwealth, sometimes follows childbirth, is nearly always fatal, and may be produced from many causes, such as retention of the afterbirth, laceration, weakness from disease, hygienic surroundings, or other causes. It does not appear from the evi-

dence what caused the hemorrhage in this instance as there was no postmortem examination held.

It is manifest from the evidence that the confinement of appellant's wife came five days sooner than they expected it; that she had resolved to do without the services of a physician in her confinement, and had influenced appellant to adopt her opinion that the services of a physician would be unnecessary at such a time; that during her labor he dutifully remained with her, and assisted her to the best of his ability, and as she directed him; that when he discovered her peril he called in two women living in the same house to assist him in caring for both mother and babe; and that upon the suggestion of one of them he immediately, and over his wife's objection, sent for a competent physician to minister to her, and that the latter, in spite of her protestations, apparently did what he could, and all she would allow him to do, to relieve her, but failed to preserve her life. In view of the foregoing facts, and the further facts that appellant was an affectionate husband, and had never appeared indifferent to his wife or neglectful of any conjugal duty, and that in failing to earlier call in a physician he acted in good faith and at her request, though he doubtless erred in so doing, we fail to find any just or reasonable ground for the verdict of the jury; indeed, we think it wholly without support from the evidence. It is manifest that the prosecution was bottomed upon the failure of the appellant to earlier provide his wife with a physician. Those of us who reverence the medical profession and implicitly trust the learning and skill of the family physician may be disposed to attribute to ignorance or prejudice such a lack of confidence in that profession as was manifested by appellant's wife, and wonder that he, in the face of such a crisis as confronted them, should have allowed himself to be influenced to trust to nature's laws, or supernatural aid, rather

than medical skill; but the fact remains that there are many who reject as they did, both medicine and surgery for other means, or supposed means of healing, and are perfectly sincere in doing so.

We may concede that appellant's wife made a grievous mistake in adhering to her purpose of rejecting medical aid, yet in view of the suffering, and, in the end, death, to which she subjected herself, her sincerity cannot be doubted. And certainly there was nothing in the evidence which tended to prove that appellant, though making the same mistake, was any less sincere than she, unless it was the fact of his sending for a physician after the birth of the child. This act, however, appears from the evidence to have resulted more from his desire to leave nothing undone for her relief than from a belief that benefit would result to the wife from the physician's presence or treatment. In any event, it was the very opposite of neglect, and should go to the credit, instead of the debit side in appellant's accounting for the offense charged in the indictment. One cannot be said in any manner to neglect or refuse to perform a duty unless he has knowledge of the condition of things which require performance at his hands. In volume 21, p. 199, Am. & Eng. Enc. of Law, it is said: "Under the common law no conviction of manslaughter predicated upon an ommission to provide medical attendance upon conscientious motives has been reported, and none can probably be had or sustained. Opinions have widely differed in all ages as to the proper mode of ministering to the sick, and, in the absence of a statute declaring it a positive duty upon a parent to call in a medical practitioner, the ommssion to do so can scarcely be considered negligence so gross and wanton as to be criminal, when the fact is admitted that the defendant acted in all good faith, doing the best he could according to his lights.'' In a note at the bottom of the same page

and volume will be found the following from the case of Reg. v. Wagstaffe, 10 Cox, C. C. 530, quoting Willes J., who said to the jury: ''That at different times people had come to different conclusions as to what might be done with a sick person. Two hundred years ago, if a child was afflicted with the king's evil, the popular feeling was, regardless of medical science, to have it touched with the royal hand, because that might result in affecting a cure. Again, in some Catholic countries a custom obtained of taking a child, laboring under disease, to a particular shrine, under a belief that it was the best course to adopt with a view to effect a cure. In such cases a man might be convicted of manslaughter because he lived in a place where all the community were of a different opinion; and in another might be acquitted, because they were all of his opinion. There was a very great difference between neglecting a child in respect to food with regard to which there could be but one opinion, and neglect of medical treatment, as to which there might be many opinions.''

It was argued for the commonwealth on the trial that the life of appellant's wife might or could have been saved if she had been attended by the physician during the birth of the child. We cannot say whether or not such would have been the result. It may also be claimed that if the physician had not been sent for at all she might have lived to rear her child, which is still alive and likely to continue so; for who can say that the hemorrhage of which the mother died was not caused by the attempt of the physician to remove the afterbirth without his instruments, or that if he had not returned to his office for the instruments he would have been present when the hemorrhage occurred, and might have prevented or checked it. The testimony throws no light on these matters. Therefore they cannot be solved, and to attempt to do so would be as idle as to invade the realm of

speculation in quest of any other unknown or unknowable thing. As well may be asked why some women die in childbirth, though attended by physicians, and others without their assistance often pass through that ordeal unharmed. We can only determine from the record before us the questions that are capable of solution, and, if correct in the conclusion hereinbefore expressed, that there was no evidence to support the verdict of the jury, it follows that the trial judge should have peremptorily instructed the jury to find appellant not guilty. Such being our view of the case, it is unnecessary to pass upon the other questions presented.

Wherefore the judgment is reversed, and case remanded for a new trial and further proceedings as directed by the opinion.