STATE OF TENNESSEE, Appellant,

*v.*

FLOYD MORRIS and WILBUR WHITE, Appellees.

456 S.W.2d 840.

(*Nashville*, December Term, 1969.)

Opinion filed June 15, 1970.

438

DAVID M. PACK, Attorney General and Reporter, THOMAS E. FOX, Deputy Attorney General, Nashville, BAXTER KEY, JR., District Attorney General, Carthage, for appellant.

THOMAS HAILE, Cookeville, CHARLES HAILE and DON DICKERSON, Nashville, for appellee.

Mr. SPECIAL JUSTICE JENKINS delivered the opinion of the Court.

The defendants, Floyd Morris, operator of the automobile that struck and killed a pedestrian, and Wilbur White, the owner and occupant of the death automobile, were indicted on June 27, 1967, and were convicted by a jury on October 25, 1967, in the Criminal Court of Clay County of involuntary manslaughter and sentenced to five years in the penitentiary.

The Court of Criminal Appeals, one member dissenting, reversed and dismissed the indictment as to the defendant, Wilbur White, owner and passenger in the automobile. The judgment of the trial court as to the defendant, Floyd Morris, the driver, was reversed and remanded for a new trial. This Court granted the State's petition for writ of certiorari.

There are two questions to be decided in this case.

(1) Whether the trial court was in error in admitting into evidence statements made by the defendant Morris to a police officer before the officer advised Morris of his constitutional rights.

(2) Whether the owner of an automobile who is riding as a passenger but is asleep or unconscious due to intoxication may properly be found guilty as an aider and abettor of the principal who operates the vehicle under the influence of intoxicants.

The proof, as it relates to these two issues, discloses that the deceased, Ellis Strong, was killed on April 29, 1967, while standing off the side of State Highway 52

near its intersection with Mill Road, between Celina and Moss, Tennessee; that the automobile left the highway at a high rate of speed, traveled approximately three hundred and fifty feet, struck a parked car, a gas pump and the decedent. There was evidence of excessive speed, beer cans on the floor of the death automobile, two on the ground, one empty and the other full.

The night of the accident, White and Morris had been drinking until 1:00 or 1:30 in the morning, and spent the night at a lakeshore cabin, arising about 5:30 or 6:00 in the morning, and had just been riding around. White asked Morris to drive "because I was drinking and he wasn't," and Morris was "more fit" and "soberer."

The accident out of which the death resulted occurred about 6:00 o'clock in the morning. The jury was fully warranted in finding that Morris was at the time of the accident under the influence of alcohol.

Both of the defendants were injured as a result of the accident and were taken to the Clay County Hospital. About 9:00 or 9:30 a.m. a member of the Tennessee Highway Patrol, in the performance of his official duties, interviewed Morris at the hospital in order to "(get) information for the accident report." Morris, according to the patrolman was bloody and "real shook up." When the patrolman asked Morris if he was driving at the time of the accident, he answered that he was. They then, at the patrolman's suggestion, went out to the patrolman's car to fill out a report, and there the patrolman asked Morris how much he had been drinking, and Morris said he had consumed "three of four beers" that morning. At no time was Morris advised of his rights to counsel and against self-incrimination. The patrolman, Kenneth

G. Pressley, was not there to serve a warrant or to make an arrest. He was simply performing a routine accident investigation.

"Q. All right, we'll just—when you went there, Mr. Pressley, what was your intention?

A. I was getting information for the accident report.

Q. All right, sir. Did you arrest the defendant?

A. No, sir.

Q. At any time during your conversation, or talk with him, did you arrest him?

A. No, sir.

Q. All right. What was your purpose for talking with him?

A. I had to have name, address, driver's license number, and things like this, for the accident report.

Q. All right, sir. At that time, did you know whether or not any violation of the laws had happened? Were you investigating as a criminal matter, or as a civil matter?

A. I was investigating it as an accident."

* * * * * *

"Q. And don't you know, as a matter of fact, knowing that there was a man that met his death out there, you knew at the time you were making this investigation and taking the statement from this defendant that in all probability that there would be a criminal prosecution in connection with it?

A. No, sir.

Q. You didn't do that?

A. No, sir."

Thus, we have presented to us whether or not Morris was denied the protection extended to him under the Fifth Amendment of the United States Constitution, and whether or not he was denied the protection of the rules laid down in *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.E.2d 694.

Morris took the witness stand in a fruitless attempt to explain away the admission he made to the patrolman. He testified that he and White had four or five beers at a tavern the night before the accident; that he had one more beer at 1:00 a.m. before going to bed. They had nothing to drink before he arose between 5:30 and 6:00 a.m.; that White had several beers after he arose, and that when he told the patrolman he had had "three or four beers" the morning of the accident he had really meant that he had consumed the beers the night before.

Apparently the jury disbelieved Morris' testimony, for they concluded that the accident resulted from the operation of a motor vehicle while under the influence of intoxicants.

The question presented to us is as heretofore stated, were Morris' rights under *Miranda* violated, and was he denied the protection extended by the Constitution of the United States?

The police officer testified that he was investigating this accident; that Morris was not in custody; that the statements made by Morris were freely and voluntarily made. That, in effect, he was acting in an investigatorial capacity, and that the finger of suspicion had not as of

then been pointed to Morris as a suspect; that no warrant had been sworn out against him.

We realize that there is a hairline of distinction between the investigatory stage and the accusatory or custodial stage. A careful examination of many decisions construing *Miranda* indicates to us that the courts have generally considered the totality of the circumstances in deciding whether the suspect was subjected to "custodial interrogation" requiring Miranda warnings.

The rules with reference to such questions are laid down under the following general headings:

1. The nature of the interrogator.
2. The nature of the suspect.
3. The time and place of the interrogation.
4. The nature of the interrogation.
5. The progress of the investigation at the time of the interrogation.

 Thus, it appears to us that every case in which *Miranda* is invoked is controlled by its own facts and the "totality of the circumstances" must be taken into consideration by the trial court in the admission of testimony of law enforcing officers with reference to statements made by defendants. The trial court sees the nature of the officer, whether or not he is fair or unfair; he hears him testify; he observes the nature of the suspect; whether he is the type that is prone to panic or to feel insecure in the presence of the officer. The trial court takes into consideration the time and place of the interrogation and generally knows the "lay of the land" in that respect. The trial courts will be allowed a wide latitude of discretion in applying the rules set out above, and unless it appears that such discretion has been

abused and the defendant's rights infringed upon, then the appellate courts will not intervene, for this is a question of fact to be decided by the trial court.

It must be remembered that in *Miranda*, the police arrested the defendant and took him to a special interrogation room where they secured a confession, and in those cases decided under *Miranda*, each defendant was thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures.

*Miranda* specifically held:

"General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. * * * In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.

"In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. * * * Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

Thus, *Miranda* gives a wide latitude of discretion to the trial courts in the admissibility of confessions, and it is ordinarily for the trial courts to say after applying the rules heretofore referred to as to whether or not the defendant's rights under the Constitution and *Miranda* are invaded. Therefore, no hard and fast rule can be laid

down by this Court in cases involving a defendant's constitutional rights and his rights under the *Miranda* holding.

We are of the opinion in the instant case that the trial court was not in error in admitting the testimony of the police officer, Pressley; that the fine line of distinction between the investigatory stage and the accusatory stage had not been crossed, for even though Morris voluntarily went outside the hospital to the patrolman's car at the time he was interviewed, it does not seem that the evils with which *Miranda* was concerned were present.

"(Morris) was not held incommunicado in an isolated setting in the privacy of an interrogation room in a police station. (He) was not swept from familiar surroundings into police custody, surrounded by antagonistic forces and subjected to the techniques of persuasion. * * * The compelling atmosphere inherent in the process of in-custody interrogation was not present. * * * We do not agree with appellants that, under any and all circumstances, Miranda protects the accused to the extent that no inquiry at all by the authorities is permissible without prior warning. For us to hold that the admission in the instant case could not be introduced in evidence solely because the procedural safeguards were not employed, would be an extension of Miranda which we feel is not compelled by the opinion. We recognize the rationale of Miranda and share the concern for justice—the constant and perpetual disposition to render every man, whether innocent or guilty, what is his due. But a balance must be maintained which does justice not only to the accused but also to society." *Gaudio v. State* (1967), 1 Md.App. 455, 230 A.2d 700.

The administration of criminal justice in this country must be rooted in fairness, and in the search for truth (which is justice), the law should be applied in an equitable manner with "the firm and continuous desire to render to everyone that which is his due."

The wings of *Miranda*, however broad they may be, are not of sufficient span to cover and protect the defendant in the instant case, and they were not intended to have such breadth.

We realize that many courts have gone out of the way to extend *Miranda* in favor of the accused and that the criminal element has sought refuge under some of the recent holdings of the Supreme Court of the United States, but in our zeal to protect the rights of the accused, the rights of society and the law abiding citizen should not be forgotten. The law enforcement officers should not be handcuffed and shackled. In order that law and order be maintained some leeway must be given officers in the investigation of crime, and therefore, the trial courts are, and should be, given much discretion in the admission of testimony by investigating officers in cases such as the one before us.

*Miranda* in sixty-four pages, some of it in fine print, simply reiterates what has been the law in this country since the Fifth Amendment to the Constitution was adopted, that is, that an accused shall not be forced to incriminate himself. It is a wrap-up of decisions favoring the accused and decries police brutality. We would not disagree with this, if we could. This, of course, is good law, and as aforesaid, has been the law since the Fifth Amendment was adopted, and before that, for fair play and good conscience would dictate this to be true. On

the other hand, the rights of society as well as the accused are involved in law enforcement and we have tried to interpret *Miranda* so that a "balance * * * be maintained which does justice not only to the accused but also to society."

When the time comes that the trial judge who saw and heard the witnesses has little or no discretion, and the appellate courts without compelling reasons or on a personal whim, substitute their judgment for that of the trial court, on a cold record, then we are not aiding justice but impeding it. There have been too many judicial termites in the temple of justice who have by their decisions chewed at the very vitals of law enforcement. This trend should be stopped, or at least slowed down; and we have tried to contribute our "Widow's Mite" in that direction.

The defendant Morris relies on *Vandegriff v. State* (1966), 219 Tenn. 302, 409 S.W.2d 370.

In *Vandegriff*, just as in the case at Bar, the defendant was questioned and certain statements were elicited from him shortly after his arrival at the hospital emergency room. At the time, the defendant was in a dazed condition, having suffered a skull fracture, a fractured nose, a fractured bone in his face, a fracture of the flora of the eye socket and a brain concussion. In holding that the defendant's statements were inadmissible, this Court speaking through Mr. Justice Creson quoted from *Escobedo v. Illinois,* (1964), 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977:

" 'We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our

adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer.' ''

The Court then went on to say:

''We take this statement to mean that once the process shifts from investigatory to accusatory, the constituional rights of the defendant come into play. It is clear from the record in the case before us that at the time these statements were elicited from the defendant, the investigatory process had focused upon the defendant and become, at this point, accusatory. The defendant had been found in the automobile in the position closest to that normally occupied by the driver. It was determined that the other male occupant of the car * * * could not have exited from the door on the driver's side, as it was so damaged that it could not be opened. It further appears in this record that within a period of an hour, or shortly more, after this questioning, Officer Baker further requested the defendant to submit himself to a drunkometer test. Thus, it may justly be said that the accusatory attention had become focused upon the defendant.''

Simply stated, *Vandegriff* stands for the proposition that once the investigatory process is concluded and the accusatory stage is reached then the defendant must be appraised of his rights. But since each case must be decided upon its own particular set of facts, the Court cannot logically conclude that the transition from investigatory to accusatory occurred here at the same time as it did in the *Vandegriff* case. Significantly, also, the present case must be decided in light of the *Miranda* decision, supra, which was not dealt with in *Vandegriff*.

■ We are, therefore, of the opinion that the trial court was not in error in the admission of the patrolman's testimony, and that the action of the Court of Appeals in sending the case back to the trial court for a new trial should be reversed and the judgment of the trial court sustained. However, the five year sentence is hereby modified so as to read "Not less than one year nor more than five years in the penitentiary" in conformity with the Statute.

Now, with reference to the defendant Wilbur White, the owner and occupant of the death vehicle.

■ He was the owner and the occupant of the automobile that struck and killed the deceased. He knew or should have known that Morris was under the influence of intoxicants or that his propensities were in that direction. They had been drinking until 1:00 or 1:30 that morning, and the automobile driver was instructed by the owner and occupant to drive because as White testified, Morris was "soberer." We are, therefore, of the opinion that the jury was warranted in convicting the owner and occupant, White, of involuntary manslaughter, because the cases in Tennessee are numerous to the effect that one who owns and rides in a motor vehicle and entrusts the operation thereof to a drunken driver, is equally guilty as an aider and abettor of the principal in either drunk driving or manslaughter.

In *Williams v. State*, 209 Tenn. 208, 352 S.W.2d 230, because Williams did not have a driver's license he permitted one Parton to drive his automobile and accompanied him in it knowing that Parton was drunk. Both were convicted of drunken driving, although Williams was not drunk. Affirming his conviction, this Court held

that Williams participated in the commission of the offense of driving an automobile while drunk and was an aider and abettor in that offense. The defendant Williams, even though he was not drunk, was present in the automobile with a drunken person and permitted the drunk person to drive the automobile, knowing he was drunk, and the Court in that case said:

"We think these circumstances reasonably warranted a finding by the jury that Williams was the owner of the car, was present on the front seat with Parton, permitted him to drive the car, knowing he was drunk, and thus was guilty of participating in the commission of the offense of driving an automobile while drunk."

This Court quoted with approval from Eager v. State:.

"In Eager v. State, 205 Tenn. 156, 169, 325 S.W.2d 815, 821, a leading case on the subject of homicide by drunken driving, one who sat by the driver and aided and abetted her in driving on the highway in a state of intoxication, was held equally guilty with her and both were convicted of involuntary manslaughter. It was there said:

'One, who, being in the possession of an automobile and in position to determine who shall operate it, places the vehicle in the hands of an intoxicated person, sits with the latter, and permits him to operate the vehicle without protest, aids and abets the offense of driving while intoxicated and may, as an aider and abettor, be convicted of the offense, provided he knew of the intoxicated condition of the person whom he thus permitted to drive.' "

In *Eager,* the Court also said:

"Thus it is that when one sits by the side of another and permits him without protest to operate the vehicle on a highway in a state of intoxication as the jury was clearly warranted that these people were doing herein, the one sitting by is as guilty as the man at the wheel. *Story v. United States,* 57 App.D.C. 3, 16 F.2d 342, 53 A.L.R. 246, certiorari denied 274 U.S. 739, 47 S.Ct. 576, 71 L.Ed. 1318; 5 Blashfield's Cyclopedia of Automobile Law and Practice, Perm.Ed. sec. 2930, p. 67; 9-10 Huddy Cyclopedia of Automobile Law, 30, 51; 5 A.J. 912. This seems to be the general principle and we see no reason why it is not sound."

It cannot be over-emphasized that sound public policy cannot permit a motor vehicle owner to escape criminal responsibility in such circumstances by getting drunk himself or going to sleep, or by claiming that he did so.

There can be no doubt under the law and the facts of this case that the jury was well warranted in finding that White was an aider and abettor in this homicide caused by Morris' drunken driving, and the action of the Court of Criminal Appeals is therefore reversed and the trial court is affirmed and the sentence imposed upon the defendant, Wilbur White, of involuntary manslaughter is affirmed, but is hereby modified so as to read "not less than one nor more than five years in the penitentiary" in conformity with the Statute.

DYER, CHIEF JUSTICE, and CRESON and HUMPHREYS, JUSTICES, concur.

McCANLESS, JUSTICE, not participating.