402 A.2d 692

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Dorothy A. KONZ and Stephen R. C. Erikson.**

Superior Court of Pennsylvania.

Argued June 2, 1977.

Decided April 27, 1979.

9. The *en banc* court opinion incorporated therein by reference the original opinion.

Richard J. Orloski, Assistant District Attorney, Allentown, for Commonwealth, appellant.

George A. Hahalis, Bethlehem, for appellee Dorothy A. Konz.

Thomas A. Wallitsch, Public Defender, Allentown, for appellee Stephen R. C. Erikson.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

PRICE, Judge:

After a five-day jury trial terminating on February 7, 1975, appellees were found guilty of involuntary manslaughter[1] in the death of appellee Dorothy Konz's husband, David. Post-trial motions for new trial and in arrest of judgment were filed. An *en banc* hearing on the motions was conducted before the Lehigh County Court of Common Pleas, and an order was issued on December 6, 1976, granting appellees' motion in arrest of judgment and thereby discharging appellees.

The Commonwealth brings this appeal and contends that the evidence presented at trial was sufficient to justify the jury's verdict, thus necessitating the reversal of the lower court order of December 6. We reverse the order of the court below granting appellees' motion in arrest of judgment, and remand for consideration by that court of appellees' remaining motion for a new trial and other appropriate action.

1. 18 Pa.C.S. § 2504.

Viewing the evidence in the light most favorable to the verdict-winner, *i. e.*, the Commonwealth, and drawing all reasonable inferences therefrom on which the jury could have properly based the verdict, *Commonwealth v. Ashford*, 227 Pa.Super. 351, 322 A.2d 722 (1974), the following was adduced at trial. The decedent, Reverend David Konz, was a professor, student counsellor and chaplain at United Wesleyan College in Allentown, Pennsylvania. Reverend Konz was a diabetic, and had administered insulin to himself on a daily basis for seventeen years.

After an encounter on campus with a visiting evangelist speaker, decedent publicly proclaimed his desire to withdraw from insulin treatment and his belief that God would heal him of his diabetic condition. Subsequent to this proclamation, Reverend Konz assured the president of the university and members of the student body that he would do nothing foolish, would carefully monitor his condition, and would take insulin, if warranted.

Appellee Stephen Erikson, a student at United Wesleyan, was a friend of Reverend Konz, and a regular visitor to the Konz home. On March 18, 1974, Erikson and Reverend Konz made a pact to pray together to enable the decedent to resist the temptation to administer insulin to himself. For a period of approximately three weeks prior to his death, Reverend Konz took insulin only once or twice.

On Saturday, March 22, 1974, the decedent experienced an acute need for insulin, and his behavior evidenced symptoms of insulin debt.[2] When decedent went to the refrigerator to obtain his insulin, he discovered that it had been removed. Evidence adduced at trial indicated that appellee Dorothy Konz had removed the insulin from the refrigerator and had hidden it from her husband.[3] Decedent then tried to exit from the kitchen, but he was initially prevented from doing so by appellee Erikson, who was purposely obstructing the

2. Decedent stated that he was very thirsty. He rushed to the kitchen sink and began to drink water. (N.T. 262).

3. The insulin was returned to the refrigerator sometime prior to Sunday night.

574

doorway leading out from the kitchen. Decedent eventually made his way to his bedroom or the bathroom. When decedent sought to go into the living room, he was again detained by Erikson, who obstructed the hallway leading from the bedroom and bathroom into the living room and prevented decedent from passing. Harsh words were exchanged, and Erikson then forced decedent into the master bedroom. There, joined by appellee Konz, Erikson talked with decedent for approximately one-half hour. During that half hour, decedent tried to telephone the police to obtain assistance, but was prevented from doing so by appellees who, in a struggle with decedent, rendered the telephone inoperable. The three later emerged from the bedroom, and subsequently decedent left the Konz household twice, both times in the company of either Mrs. Konz or Mr. Erikson. Later in the afternoon, decedent cancelled a speaking engagement of his which was scheduled for the following day—Sunday.

The nature of the deceased's first journey is unclear. The record only indicates that some time during the late afternoon or early evening he and appellant Erikson left the Konz house for a short time.

During his second journey from his home on Saturday night, this time accompanied by Mrs. Konz, the decedent went to a local hospital to pick up Esther King, a close friend of the family who worked as a practical nurse at the hospital and who was leaving work when the Konzs arrived. At that time, the decedent was experiencing additional symptoms of insulin debt, to-wit, he appeared tired and was complaining of an upset stomach.

Upon returning home from the hospital, the decedent became increasingly ill, vomiting intermittently Saturday night through Sunday morning, and he was confined to bed practically all day Sunday. During this time, appellees, in effect, kept decedent isolated to the point of turning away visitors on Sunday, even though Reverend Konz was desirous of discovering whether one of the visitors wished to see him.

Despite the fact that throughout Saturday and Sunday decedent was experiencing symptoms of lack of insulin, and such symptoms were apparent to those around him, appellees did not seek to obtain medical assistance for the decedent and at no time sought the advice of any medical experts. It should be noted, that the seriousness of decedent's condition was readily apparent even to the Konzes' eleven year old daughter, Amy, who asked her mother why no doctor was summoned.

Instead of seeking medical attention for decedent, appellees chose to administer cracked ice and keep decedent, in effect, isolated. Decedent's condition grew progressively worse as the evening wore on, and his death occurred at approximately 6:00 a. m. Monday. Cause of death was determined to be ketoacidosis resulting from lack of insulin. Although Mrs. Konz was aware of her husband's death as early as 7:30 a. m. Monday, she did not attempt to notify the authorities until 5:00 p. m.

Appellees were found guilty by a jury of the crime of involuntary manslaughter. Section 2504 of the Pennsylvania Crimes Code [4] provides that:

"A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, he causes the death of another person."

To impose criminal liability based on an omission as opposed to an act, the omission must be "expressly made sufficient by the law defining the offense," [5] or "the duty to perform the omitted act [must be] otherwise imposed by law." [6]

We hold that appellee Dorothy Konz, as wife of decedent, was under a duty to obtain medical aid for her diabetic husband when it became readily apparent that he was

4. 18 Pa.C.S. § 2504.

5. 18 Pa.C.S. § 301(b)(1).

6. 18 Pa.C.S. § 301(b)(2).

suffering the effects of lack of insulin, and in serious need of medical attention.[7]

The state of the law as to the duty owed by one spouse to obtain medical assistance for the other is not well-settled, with only a handful of cases addressing the issue. Indeed, our research uncovered no recent Pennsylvania case of import to the instant appeal. Nevertheless, a review of the case law from other jurisdictions discloses a duty of care, vague though it may be, arising from the spousal relationship. In the case of *Territory v. Manton*, 8 Mont. 95, 19 P. 387 (1888), the Supreme Court of Montana, in imposing a duty upon the defendant to seek medical aid for his wife who died of exposure, stated: "[the defendant's] drunkenness does not excuse him from the discharge of his duty to his wife as husband." *Id.* at 109, 19 P. at 394. In the case of *Jones v. United States*, 113 U.S.App.D.C. 352, 308 F.2d 307 (1962), the court stated that, "[t]here are at least four situations in which failure to act may constitute breach of a legal duty. One can be held criminally liable . . . where one stands in a certain status relationship to another . . . ." *Id.* at 355, 308 F.2d at 310; *see* 40 Am.Jur.2d Homicide § 90 at 383 (1968). It should be noted that the

7. We hold that appellee Stephen Erikson is an accomplice under 18 Pa.C.S. § 306(c), and as such, maintains a culpability equal to that of Mrs. Konz. Therefore, all further analysis with respect to Mrs. Konz applies equally to appellee Erikson. *See also* 40 Am.Jur.2d Homicide § 90 at 385 (1968).

An interesting question arises as to whether it is possible to have "the intent of promoting or facilitating the commission of the offense," 18 Pa.C.S. § 306(c)(1), where the offense is one based on gross negligence or recklessness, which do not themselves require specific intent. While this specific question heretofore has yet to be addressed by an appellate court in this state, a review of case law from other jurisdictions lends support to the proposition that one can be an accomplice or an aider and abettor to the offense of involuntary manslaughter even though intent is not an element of the offense itself. *See, e. g., Fitzhugh v. State*, 207 Ark. 117, 179 S.W.2d 173 (1944); *State v. Newberg et al.*, 129 Or. 564, 278 P. 568 (1929); *State v. McVay*, 47 R.I. 292, 132 A. 436 (1926); *State v. Morris*, 224 Tenn. 437, 456 S.W.2d 840 (1970); *Wade et al. v. State*, 174 Tenn. 248, 124 S.W.2d 710 (1939); *State v. Hopkins*, 147 Wash. 198, 265 P. 481 (1928), *cert. denied* 278 U.S. 617, 49 S.Ct. 21, 73 L.Ed. 540. *See generally*, Annot. 95 A.L.R.2d 175 (1964).

court cited the marital relationship as one such "status relationship." *Id.* at 355 n. 9, 308 F.2d at 310 n. 9.

In light of the above cases, we conclude that the marital relationship creates a duty of care between the two spouses. We hold that one spouse owes the other a duty to summon medical aid when the other is in a condition necessitating the need for immediate medical attention.

The dissent seeks to establish a standard of care between spouses such that "one spouse is not under a duty to call for medical help for the other spouse, if the spouse is not helpless" (dissenting opinion at 699), citing the cases *State v. Mally*, 139 Mont. 599, 366 P.2d 868 (1961), and *Westrup v. Commonwealth*, 123 Ky. 95, 93 S.W. 646 (1906), to support its proposition. Although the courts in both cases mention a state of helplessness in the deceased as a factor in their decision, there are significant distinctions between those cases and the instant case. In *Westrup*, the husband of the deceased obtained medical aid for his wife, and his wife unwaveringly refused treatment. In *Mally*, the husband also summoned medical aid for his wife, although at a late date. In imposing a duty upon the husband to obtain medical aid for his wife, the court in that case noted: "[t]he record is replete with evidence that [the wife] could not have consciously or rationally denied medical aid." 139 Mont. at 609, 366 P.2d at 873. In the instant case, the record does not indicate that Reverend Konz refused or would have refused any medical assistance. Indeed, the record supports the opposite conclusion. Reverend Konz, upon discovering his insulin removed from the refrigerator, sought to contact the authorities to obtain aid, but was prevented from doing so by appellees. On the day before Reverend Konz's death, visitors to the Konz residence were not allowed admittance to see him, even though the decedent seemingly welcomed their company.

In reviewing the record of this case, it is apparent that the symptoms of Reverend Konz's insulin debt were in evidence throughout the weekend and were apparent to those around

him—even his eleven year old daughter. The decedent began to experience the acute need for insulin on Saturday morning. He was very thirsty, vehemently expressed his desire for insulin, and even went so far as to attempt to summon medical assistance for himself. Later in the day, he cancelled an upcoming speaking engagement, and as the day wore on he appeared tired and began to complain of stomach cramps, both being additional symptoms of insulin debt.

His condition increasingly deteriorated as the weekend wore on, with the decedent frequently vomiting throughout Sunday, and being bed-ridden practically all day. Despite the fact that his condition grew progressively worse, his wife summoned no aid. Indeed, she not only failed to summon aid, but, in effect, prevented her husband from making contact with any outsiders, against his wishes. Taking into consideration the above mentioned facts, and Dorothy Konz's knowledge of decedent's diabetic condition and his lack of insulin injections over a three-week span prior to this time, we find that she, as decedent's wife, had a duty to summon medical assistance for him.

Judge Spaeth, in his dissenting opinion, proposes that appellees' duty was only to be on guard for the onset of a state of helplessness in the deceased. Of course, as applied to the instant case, this standard is worthless, since medical testimony adduced at trial indicated that when a diabetic suffering from lack of insulin lapsed into such a state, he is beyond help. Therefore, under the circumstances of this case, we hold that Mrs. Konz, as wife of the deceased, and Stephen Erikson, as accomplice to Mrs. Konz, were under a duty to summon medical aid for Reverend Konz, and this duty was breached.

Of course, a finding of duty and breach thereof is not in itself sufficient to support a conviction for involuntary manslaughter. There must also be a finding of proximate cause. As applied to the instant case, there must be sufficient evidence in the record to support a finding by the jury that Reverend Konz's death was the direct and immediate consequence of appellees' breach of duty.

We hold that there was sufficient evidence to establish proximate cause. Medical testimony presented at trial indicated that hospitalization as late as Sunday night would have assured Reverend Konz a ninety-nine percent chance of survival. In light of the evidence, the jury was justified in making a finding of proximate cause.

We reverse the order in arrest of judgment and remand for consideration by the court below of the remaining motion for a new trial and other appropriate action.

CERCONE, President Judge, concurs in the result.

VAN der VOORT, J., files a concurring opinion.

SPAETH, J., files a dissenting opinion.

JACOBS and WATKINS, former President Judges, and HOFFMAN, J., did not participate in the consideration or decision of this case.

VAN der VOORT, Judge, concurring:

I join in the Majority Opinion authored by PRICE, J., and add the following analysis. The decedent, David Konz, 34 (a diabetic) in this charge of involuntary manslaughter made a statement in church that he was going to ask God to heal his diabetes and that he would no longer need to take insulin. The President of the Wesleyan Bible College at which the decedent taught reminded the decedent that Christianity approves of normal healing practices by physicians to which reminder decedent said that he would do nothing foolish and that he would resume insulin injections if his blood sugar went up. Nineteen days later upon returning to his home he found that his insulin had been removed from his refrigerator. The record shows that his wife, Mrs. Konz, had hidden it. The decedent said he was thirsty, walked to the sink to get water and said he wanted his insulin and attempted to leave his house but the defendant Erikson, a 25 year old, blocked the doorway. The decedent tried to exit through his living room but Erikson blocked the hallway and forced the decedent into his bedroom where defendants Erikson and

Mrs. Konz (wife of the decedent) remained for half an hour. During this time when the decedent said he was going to call the police the telephone connection was broken. The decedent was seized with ketoacidosis resulting from lack of insulin and he died at 6:00 A.M., on March 25, 1974.

I believe the facts and circumstances of this case clearly prove guilt of involuntary manslaughter by defendant-appellees. I agree that the Order of the lower court should be reversed, the verdicts finding appellees guilty should be reinstated, and the case be remanded to the court below for its consideration of the motion for a new trial.

SPAETH, Judge, dissenting:

I believe the lower court's order arresting judgment should be affirmed.

-1-

The majority states two different definitions of the duty of one spouse to summon medical aid for the other spouse. At one point the majority says the duty arises when it is apparent that the spouse is "in serious need of medical attention." at 695. At another point the majority says the duty arises when the spouse is "in a condition necessitating the need for immediate medical attention." at 695. Which test does the majority intend to adopt? I do not ask this question in order to conjure up an imaginary difficulty; to the contrary, I think the case at hand shows that the difficulty is real. It could easily be said that appellees had reason to know that David Konz was in *serious* need of medical attention, but not that he needed *immediate* attention.

Furthermore, the majority's test—whichever it is—subjects those bound by it to a peculiar burden. Assuming that the test will encompass situations in which the sick spouse (let us say, the husband) is not helpless and can summon aid for himself, then his wife must do for him what he is able to do for himself, or suffer criminal penalties, the most severe sanction the law can apply. I know of no other area of the law in which this is the case.

There is still another difficulty about the majority's definition of appellees' duty.[1] The majority indicates that it might not impose that duty if the sick spouse unwaveringly refuses help. at 695. This puts the other spouse in the difficult position of deciding how hard to argue the case for medical aid in the attempt to make the sick spouse waver, and of determining when the sick spouse is "unwavering" enough to make it safe to stop arguing. The majority avoids this problem because it finds that David Konz did not refuse medical aid, but, rather, actively sought it. The record, however, does not support that finding. True, Konz attempted to take his insulin Saturday afternoon, and when prevented, attempted to call the police (N.T. 307, 318) (which is not necessarily the same as "summon[ing] medical assistance", at 695). However, this does not show that he had abandoned his general intention to do without medical support in his belief that he was healed; he had taken insulin twice previously during his program of abstention, and had then continued to abstain. Furthermore, he later had the opportunity to obtain medical help, when he was inside the hospital Saturday night, but made no effort to obtain it. The majority finds support for its assertion that Konz wanted medical help in the fact that he "seemingly welcomed," at 696, the company of visitors on Sunday afternoon. How this fact enlightens the majority about Konz's medical intentions is not apparent.[2]

[1] The majority finds Erikson guilty as an accomplice under 18 Pa.C. S.A. § 306(c). This raises the question whether it is possible to have "the intent of promoting or facilitating the commission of the offense," § 306(c)(1), where the offense is based on gross negligence or recklessness, which do not themselves involve specific intent. I should not find it necessary to discuss Erikson's duty, since it could not in any case be heavier, or more exacting, than Mrs. Konz's duty as a spouse. I shall discuss what I think Mrs. Konz's duty was, *infra*.

[2] In deciding that it was "readily apparent," at 694, that Konz was in serious need of medical help (or needed immediate medical help), the majority makes much of the fact that the Konzes' daughter, who was 11, asked her mother why a doctor was not called. While I might agree that appellees should have known that Konz was at least in serious need of medical help, I shall draw that conclusion on the

-2-

Although I agree with the majority that Mrs. Konz had a duty toward David Konz as her spouse, I should define that duty differently than does the majority.

It is well settled that a parent has a duty to act to protect the welfare of a child. *See, e. g., Commonwealth v. Signervski,* 14 Pa.Dist. 361 (1914); *Commonwealth v. Breth,* 44 Pa.County Ct. 56 (1915); *Palmer v. State,* 223 Md. 341, 164 A.2d 467 (1960); *State v. Staples,* 126 Minn. 396, 148 N.W. 283 (1914). The reason for imposing this duty is obvious: children are dependent on their parents; without their parents' care they may be helpless. The duty arising from the relationship between husband and wife, however, is not so easily defined. Certainly one spouse may not be indifferent to the health and safety of the other; but spouses are adults and can presumably care for themselves, and in some cases might prefer to. Courts in other jurisdictions have resolved this tension by imposing a duty upon one spouse to help the other spouse if the other is helpless. Thus in *State v. Mally,* 139 Mont. 599, 366 P.2d 868 (1961), where the defendant was found guilty of involuntary manslaughter because he had failed to get prompt medical help for his wife, who had suffered an injury, the court said:

> We are aware that the large majority of homicide cases involving a failure to provide medical aid involve a parent-child relationship. This is undoubtedly due to the fact that a person of mature years is not generally in a helpless condition. However, *fact situations do arise, such as the instant case, wherein it is apparent that an adult is as helpless as the newborn.* The record is replete with evidence that [the wife] could not have consciously or rationally denied medical aid.[3]

139 Mont. at 609, 366 P.2d at 873 (emphasis supplied).

basis of other evidence, and not regard as probative the medical judgment of an 11-year-old.

3. There was evidence that the wife had refused the defendant's suggestion that he summon medical help. However, other evidence showed that she was comatose most of the time after her injury.

*Westrup v. Commonwealth,* 123 Ky. 95, 93 S.W. 646 (1906), illustrates the same principle. There the court said that a husband who neglected to provide medical care for his wife might be guilty of involuntary manslaughter, if it appeared that she was helpless and unable to appeal elsewhere for aid, and that her death was the natural and reasonable consequence of her husband's negligence. On the facts before it, the court held these requirements had not been satisfied. The husband was charged with involuntary manslaughter for the death of his wife during childbirth. The wife had decided that she did not want medical assistance, and the husband did not override her wishes until after complications had set in.

I find that the rule of these cases is a wise one; I should therefore hold, with a qualification, or extension, to be noted, that one spouse is not under a duty to call for medical help for the other spouse, if the other spouse is not helpless. To hold that one spouse (let us say, the wife) might be held criminally liable for not overriding her husband's wishes and calling a doctor to treat him, even though her husband was not helpless, and was fully capable of getting treatment for himself, would be to say that a person might be imprisoned for not trying to frustrate the intention of someone who appeared to be a competent adult. This would be unfair in a double sense: it would be unfair to the husband, for while acknowledging his competence, it would require him to be treated as less than competent, and it would be unfair to the wife, for it would provide her with no understanding, or notice, of when, or why, she was obliged to treat a competent adult as though he were less than competent.

It may be suggested that this rule does not avail appellees, for anyone who, like Konz, believes he may cure himself of diabetes by religious faith alone cannot be regarded as "a competent adult." This suggestion, however, is not acceptable. Assume for discussion that Konz's belief, or faith, was wrongheaded in the sense of being without any factual basis, and that Mrs. Konz knew that this was the case. It does not follow that Mrs. Konz was obliged to regard her

husband as less than a competent adult, and, at the risk of incurring criminal liability, call for medical help. The evidence was that Konz had told both the college president and the students that he would not do anything foolish but would resume his insulin injections if that became necessary. Also, a friend (not Erikson) testified that Konz's agreement with Erikson was only that before he resumed his injections, they would pray. N.T. 421. The situation thus presented was somewhat similar to that presented in *Westrup v. Commonwealth, supra,* where the court, noting that the wife had "peculiar ideas" about the inadvisability of physicians at childbirth, said:

> We may concede that [the defendant's] wife made a grievous mistake in adhering to her purpose of rejecting medical aid, yet in view of the suffering, and, in the end, death, to which she subjected herself, her sincerity cannot be doubted.

123 Ky. at 101, 93 S.W. at 647.

Finding that the husband had acted in good faith and at his wife's request in not calling a physician sooner, the court found no breach of the husband's duty to his wife. I do not say that "sincerity" is the only relevant consideration. However, given Konz's evident sincerity, and his assurances that he would not do anything foolish, I am unwilling to hold that Mrs. Konz was, as a matter of criminal law, obliged to call for medical help before her husband became helpless, in an attempt to frustrate his announced intention of doing without his insulin.

I should nevertheless augment Mrs. Konz's duty to her husband (and by hypothesis, Erikson's duty, *see* footnote 1 *supra* ) in one respect. While holding that they had no duty to call for medical help before Konz became helpless, I should hold that in the particular circumstances of this case they had a duty to be on guard for the onset of such a state of helplessness. Appellees knew or so the jury could have found—that Konz had not had much if any insulin for three weeks, and that at a minimum he was risking serious illness by not taking insulin; in addition, appellees saw Konz

become suddenly and violently ill on Sunday. In these circumstances, appellees' duty to Konz included the duty to keep close watch over him. If there was evidence that during Sunday night Konz became visibly comatose, for example, I could not excuse appellees of a breach of duty to him merely because they had gone to sleep and were unaware that he had lapsed into a helpless state.

-3-

Having defined the duty owed Konz, I must ask whether the evidence was sufficient to support a finding of breach. Given my definition of the duty, this inquiry is a double one: Did appellees observe Konz become helpless? If not, would they have, had they kept close watch over him? The observable nature of Konz's helplessness is important, for if at any time appellees had reason to believe that Konz was no longer able to make a *competent* decision to forgo medical aid, at that time they came under the duty to help him, even though he might have continued to deny that he wanted help. *See State v. Mally, supra.*

The critical period is Sunday and Monday. The evidence is insufficient to support a finding of visible helplessness on Sunday during the day. Although Konz was vomiting and clearly was ill, he could walk (he used the bathroom) and he was alert and rational (he heard the voices of the visiting friends and called to see if they wanted to talk to him). The only evidence that Konz reached a point where he could be said to have been visibly helpless was evidence that late Sunday night or early Monday morning, Erikson found Konz mumbling in his sleep. Erikson told the police on Monday that this occurred at 3:45 a. m. Monday. N.T. 289. (Later, he said it was on Sunday or early Monday morning. N.T. 309–310). He said he asked Konz some questions to see if Konz could answer them, such as what time chapel started. I have no way of judging the correctness of Konz's answer; on the surface, it appears lucid.

Mindful as I am of our duty to examine the evidence in the light most favorable to the Commonwealth, still, I

cannot say that here the evidence was sufficient to support a finding that sometime during Sunday or early Monday, Konz became visibly helpless to appellees. It cannot be held, therefore, that appellees breached a duty to call for medical help.

A further comment, however, is required. I have said that in the particular circumstances here appellees had a duty to keep close watch over Konz. Perhaps if Mrs. Konz had not gone to bed but had remained awake, late Sunday night and early Monday morning, watching over her husband, she would have seen him lapse into a helpless condition. Whether she would have seen this happen, however, is a matter of mere speculation: for all anyone can say, she would have seen nothing that could be characterized as manifesting a lapse into a helpless condition. While guilt may be based on inference, it may not be based on speculation. *Commonwealth v. McFadden,* 448 Pa. 277, 292 A.2d 324 (1972); *Commonwealth v. Bailey,* 448 Pa. 224, 292 A.2d 345 (1972); *Commonwealth v. Wilson,* 225 Pa.Super. 513, 312 A.2d 430 (1973). The difference between an inference and a speculation is that an inference is a reasoned deduction from the evidence, a speculation is a guess. Here, to say that if Mrs. Konz had kept watch she would have seen something happen that would have warned her that her husband had lapsed into helplessness is to guess; for the accuracy of the statement cannot be tested by measuring it against the evidence.

In addition to finding that there is no evidence of Konz's visible helplessness, I further find that, even if there were, it was not proved that appellees' failure to call for medical aid was the cause of Konz's death, as § 2504 requires. At trial, the Commonwealth's expert made it plain that Konz's life could have been saved *if* medical help had been summoned *and* the responding physician had found Konz in a certain condition, namely: "arousable", "not unconscious"; "some degree of coherence"; "able to ambulate"; blood pressure "at least stable"; "not in shock." N.T. 190–194. Furthermore, on cross-examination the expert specifically refused to

vary these symptoms, which are precisely the symptoms that appellees would have been justified in relying upon to decide that Konz was *not* helpless and was still able to change his mind and ask for aid. An ironic, or better, a sad, conclusion follows. Suppose that Konz had not responded to Erikson's questions, late Sunday or early Monday, or that for some other reason Mrs. Konz or Erikson had become alarmed and had tried to rouse Konz but could not. Then their duty would have been to call for medical help. The call, however, would have come too late; the condition of helplessness into which Konz would have lapsed would have been a condition from which the responding physician could not have saved him—or at least this may be inferred, for in discussing the period during which Konz might still have been saved, the expert firmly refused to go beyond the time when the symptoms on which he based his opinion of survivability still existed; nor did the Commonwealth offer any evidence, as for example by another expert, that given a worsening of symptoms, Konz might still have survived. Thus, although it could be said that appellees had breached their duty to Konz, it could not be said that the breach had caused his death.[4]

The majority chides me for drawing up a standard that is "worthless," at 696, for by holding that the duty to call for medical help never arose until Konz became visibly helpless, I have made it inapplicable to—it does not exist in—cases where someone, like Konz, may be in *fact* helpless though not *visibly* so. I can only respond that it is a criminal case we are deciding. If criminal liability is to be imposed, the duty of the accused must be so specifically defined that the accused may understand it, and the jury decide whether it has been breached. One should not define a duty according to the result one would like to reach on the facts of a given case. Instead, one should define the duty first, and then look to see whether the facts show a violation of that duty.

4. Because of the result I should reach, I need not consider whether any breach of any duty by appellees was reckless or grossly negligent, 18 Pa.C.S.A. § 2504. The majority finds appellees guilty without discussing this requirement.

-4-

Upon reflection, I have concluded that the differences between the majority's position and mine are attributable to the majority's acceptance of one or the other of two arguments.

One argument was advanced by the Commonwealth: that through the crucial weekend appellant was a "mechanical man" (the Commonwealth's label for a diabetic who suffers from ketoacidosis and functions only by rote even though his cognitive processes are critically diminished). The Commonwealth's brief cites to 42 pages in the record to support this argument. In fact, there was only *one* place where the expert described such a syndrome and his description was brief:

> The end result of this, the decrease in the blood volume, the electrolyte imbalances, the acidosis, the ketosis, is to make someone lethargic, meaning to make him drowsey, he loses his appetite, terrible thirst. Subsequently he *may* go on to a *decreased mental alertness*, which may, in turn, culminate in coma and eventually death . . . . .

> N.T. at 51 (emphasis supplied).

There is no evidence that Konz reached this state on Saturday or Sunday or, if he did, that there were outward signs of it that should have alerted appellees.

The other argument was *nowhere* advanced: that Konz was a sort of psychological prisoner of his wife and best friend. It is not surprising that this argument was not advanced; there is no evidence in the record to support it; to the contrary, the testimony was uniform that Mrs. Konz was subservient to her husband's wishes in every respect. However, the majority must believe something of the sort; how else could it make the assertions, which are without any support in the record, that appellees "kept decedent, in effect, isolated," at 695, or that they "prevented her husband from making contact with any outsiders, against his wishes,"

at 696?[5] During the Sunday visit by friends, Konz merely called out to see *if* one of the visitors wanted to see *him*. When told that Konz had an intestinal ailment (which at least superficially was correct), the visitor chose not to see him. Konz did not say that *he* wanted to see anyone; nor is there any reason to think that if he had felt imprisoned or isolated, he could not simply have walked out of his bedroom, or called out and enlisted the visitor's aid.

The majority further ignores the two times that Konz left the house during the weekend. When Konz was inside the hospital with his wife, on Saturday night, talking to a nurse, with hospital staff and equipment presumably surrounding him, he was not isolated against his will. On the basis of the record, one must assume that he was no longer being frustrated in any attempt to get medical help, but simply did not want it.

I should affirm the order of the lower court.

---

5. Because of its repeated emphasis on this aspect of the case, the majority seems to regard appellees' acts as acts of commission rather than omission. That is not the way the Commonwealth presented the case; indeed, acts of commission would seem to lead more appropriately to a charge of murder than involuntary manslaughter.