IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

MAY 1998 SESSION

FILED

December 9, 1998

Cecil W. Crowson
Appellate Court Clerk

| STATE OF TENNESSEE, | * | C.C.A. NO. 01C01-9704-CC-00122 |
| | | |
| APPELLEE, | * | MAURY COUNTY |
| | | (Transferred from Giles County) |
| VS. | * | Hon. William B. Cain, Judge |
| | | |
| STEPHEN JOHN ABBOTT, | * | (Second Degree Murder (Two Counts); |
| | | Attempted First Degree Murder; and |
| APPELLANT. | * | Attempted Second Degree Murder) |

For Appellant:

Hershell D. Koger
135 N. First Street
P.O. Box 1148
Pulaski, TN  38478

Larry L. Roberts
627 Second Avenue South
Nashville, TN  37210

For Appellee:

John Knox Walkup
Attorney General and Reporter
450 James Robertson Parkway
Nashville, TN  37243-0493

Karen M. Yacuzzo
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN  37243-0493

Mike Bottoms
District Attorney General
P.O. Box 459
Lawrenceburg, TN  38464

OPINION FILED: _____

REVERSED AND REMANDED FOR NEW TRIAL

GARY R. WADE, PRESIDING JUDGE

## OPINION

The defendant, Stephen John Abbott, was indicted in Giles County for two counts of first degree murder and two counts of attempted first degree murder. After a change of venue to Maury County, he was convicted of second degree murder for the deaths of Carolyn Foster and Diane Collins (counts 1 and 2), the attempted second degree murder of Carol Yancy (count 3), and the attempted first degree murder of Ron Shirey (count 4). The trial court imposed sentence as follows:

| count 1 | second degree murder | twenty years |
|---------|----------------------|--------------|
| count 2 | second degree murder | twenty years |
| count 3 | attempted second degree murder | ten years |
| count 4 | attempted first degree murder | twenty years |

The two second degree murder sentences are to be served consecutively with release eligibility after service of at least eighty-five percent of the forty-year term.[1]

In this appeal of right, the defendant presents the following issues for review:

(1) whether the evidence is sufficient to support the verdicts of guilt for all four offenses;

(2) whether the trial court erred by refusing to grant the defendant's motion for judgment of acquittal at the close of the state's proof;

(3) whether the indictment sufficiently charges each offense;

(4) whether the juvenile court erred by transferring the defendant to circuit court to be tried as an adult;

(5) whether the juvenile court erred by consolidating the defendant's transfer hearing with that of his co-defendant;

---

[1] "There shall be no release eligibility for a person committing [second degree murder] on or after July 1, 1995." Tenn. Code Ann. § 40-35-501(i)(2).

2

(6) whether the trial court erred by overruling the defendant's motion to suppress his oral statements;

(7) whether the trial court erred by refusing to strike certain potential jurors for cause;

(8) whether the trial court erred by refusing to grant the defendant's motion for a change of venire;

(9) whether the trial court erred by allowing evidence that the defendant and co-defendant were wearing black clothing at the time the crimes were committed;

(10) whether the trial court erred by failing to charge the lesser offense of facilitation of a felony; and

(11) whether the trial court erred by imposing an excessive sentence.

We must reverse and remand for a new trial due to the failure to charge the lesser offense of facilitation of a felony.

On November 15, 1995, Deputy Kyle Helton of the Giles County Sheriff's Department drove to Richland High School to teach a class about the importance of avoiding drugs and violence. Upon his arrival at 7:55 A.M., he learned that someone had just been shot. When he saw blood on the floor and "people laying in the hallway," he contacted the sheriff's department, seeking additional help. He then determined that Carolyn Foster and Carol Yancy, both teachers, had suffered gunshot wounds to the head area and that a student, Diane Collins, had been shot in the neck. The weapon used was a .22 rifle. Officer Helton took Jamie Rouse into custody; the defendant was not "anywhere around ...."

Agent Wayne Wesson, of the Tennessee Bureau of Investigation, interviewed the defendant twice on the day of the shootings. On each occasion, the defendant provided a signed, written statement. At about 1:30 P.M., the defendant told Agent Wesson that he had known Rouse for about one and one-half years and

3

that they had been good friends. He revealed that Rouse liked heavy metal music and was rumored to be a Satan worshiper. The defendant stated that Rouse had carved an inverted cross on his forehead once before, always wore black, and had previously shaved his head. The defendant recalled that the evening before the shootings, Rouse had said that he was tired of school and wanted to quit. He told Agent Wesson that on the day of the shooting, Rouse called the defendant and informed him he would pick him up for school early. They arrived at school at approximately 7:55 A.M. and Rouse left his truck armed with a .22 rifle. The defendant claimed that he called out to Rouse, who did not respond but proceeded into the school. The defendant stated that Rouse attempted to fire his weapon at Ms. Foster, but the safety was in place. He recalled that Rouse lowered the gun, disabled the safety, and fired at Ms. Foster again and then fired at Ms. Yancy. The defendant claimed that he then left the area and heard one or two more shots. He asserted that he knew nothing about Rouse's intentions and had not noticed the rifle in the vehicle.

In a second statement, provided at 6:15 P.M. on the day of the murders, the defendant revealed that he and Rouse wanted to quit school because they did not "fit in." He acknowledged that on the night before the shooting, Rouse talked about killing a trooper who had given him a ticket and killing Tina Mueller, someone with whom he had argued. He told Agent Wesson that when Rouse asked if he wanted to help, he responded, "I don't know." The defendant also recalled Rouse saying "he was going to take care of Shirey and Hobbs." When Rouse asked if he would help, the defendant "laughed and said, yeah." The defendant explained that he did not really believe Rouse would follow through on the threats. The defendant acknowledged that he saw the rifle when he got into the truck. He recalled Rouse, who had a "brick of shells," said, "it's going to happen

4

today." He remembered that on the way to school, Rouse threatened to shoot "anyone who gets in my way" and that Rouse stopped at the residence of Stephen Ray, showed him the gun and shells, and claimed, "It's going to happen today." When Ray responded, "You're crazy," the defendant contended that he indicated agreement. After leaving the Ray residence and upon arriving at the high school, Rouse asked, "Are you ready?" The defendant recalled that Rouse then took the weapon and left. The defendant emphasized to Agent Wesson that he did not believe Rouse would shoot anyone and that he "was shocked" by what had occurred.

Michael Chapman, chief investigator for the Giles County Sheriff's Department, interviewed the defendant a day later. He stated that the defendant admitted to driving the truck to school. Officer Chapman testified that the defendant had stated that Rouse did not mention shooting a trooper until after the defendant started driving Rouse's truck.

Sheriff Eddie Bass testified that he was called to the scene of the shootings immediately. When he located the defendant, the defendant was wearing "[b]lack from head-to-toe. Shirt, pants, boots. I believe a black coat, also."

Rebecca Lee Giles, who arrived at Richland High at about 7:30 on the morning of the shootings, saw Jamie Rouse come through a doorway at about 7:55 A.M. Rouse, who carried a gun at his side, shot Ms. Yancy and Ms. Foster. Ms. Giles, who immediately fled to the parking lot, testified at trial that the defendant was not present and that Rouse appeared to be acting alone.

Carol Yancy, a teacher at the school, testified that on the morning of

5

the shootings, she and Carolyn Foster were standing in the doorway to Ms. Foster's classroom when Rouse approached them with a rifle. She had no other recollection until she regained consciousness on the way to the hospital. A gunshot wound to her head required hospitalization for several days.

Teacher Ralph Johnson recalled hearing a noise that sounded "like two firecrackers," looking into the hallway, and seeing Ms. Yancy and Ms. Foster on the floor. When he heard another shot a few seconds later, he ran toward the shooting and helped take the murder weapon away.

Ron Shirey, a teacher and coach who was responsible for much of the discipline at the school, was to monitor the halls until classes began. He heard a loud pop, saw Ms. Collins "holding her neck or throat" and bleeding profusely, and then saw Rouse armed with a rifle.

Rachel Warren Harmon, who grew up with and rode the bus with the defendant and Rouse, worked with them at Delta Express, a truck stop. She testified that on the evening before the shootings, she noticed Rouse and the defendant engaged in conversation outside the business. She remembered that they stopped their conversation when she approached them and the defendant stated, "We'll just discuss it later."

Jim Matthews, a criminal investigator for the District Attorney's office, found a black jacket, several compact discs and a CD case, and 433 .22 long rifle, high velocity cartridges in Rouse's truck.

Dr. Ann Bucholtz, who had performed an autopsy on fourteen-year-old

6

Diane Collins, determined that a gunshot wound to the neck had caused her death. Dr. Charles Warren Harlan, who performed an autopsy on Carolyn Foster, determined that gunshot wounds to the head and the neck had caused her death.

Billy Rogers, a student at Richland High School, also worked at Delta Express. He recalled the defendant saying that he might lose "a couple of friends tomorrow"; when he asked their identity, the defendant responded, "If there was a Lord, he better make it snow, so we ain't got school tomorrow."

Danielle Robinson, a student at the high school, remembered passing Rouse in the hallway and seeing the gun. She then saw the defendant, eight or ten feet away, and told him Rouse had a gun. She recalled his response, "He does?" She testified that she saw the defendant later in the day and that he was "in a daze," pale, and unresponsive.

Student Beth Rogers, a cousin to Rouse, testified that when Ms. Collins was shot, her boyfriend grabbed her and shoved her into the bathroom. Immediately after the shooting, she saw the defendant, pale and crying, in the parking lot. When she asked the defendant whether the rifle was in the front of the truck, the defendant responded, "No, it must have been in the back." Ms. Rogers also recalled that Rouse had previously threatened to kill people, but that she did not take him seriously.

Stephen Ray testified that on the morning of the shootings, the defendant and Rouse had stopped at his residence on their way to school. He recalled that Rouse was driving the truck and that a rifle was on the seat in plain view. Ray testified that Rouse acknowledged that the weapon was his. When he

asked Rouse, "Who are you going after," either Rouse or the defendant replied "Hobbs [the school principal] and whoever gets in the way." Ray, who was uncertain which of the two responded, then saw a box of ammunition and a gun clip in the truck. He could not recall whether Rouse or the defendant warned him to stay in the parking lot at school, "because they didn't want me hit by any stray bullets." Ray remembered that the defendant moved into the driver's seat before driving away and that Rouse was in the passenger seat. Ray testified that he did not think Rouse was serious about actually shooting anyone.

When Ray arrived outside the school, he saw Rouse walking toward the door carrying a rifle in his left hand. Ray then recalled gunshots: "two somewhat close together, and a slight pause, and then a third." Afterward, Ray saw the defendant walking in the parking lot; he described the defendant on the "verge of tears, pale, [t]rembling, [j]ust general shock." Ray recalled the defendant said he could not "believe he done it."

Several witnesses testified for the defense. Thomas Ray, Stephen Ray's father, was a character witness for the defendant. He described the defendant as "[e]ven-tempered ... [an a]verage teen-ager and a good boy." Rick Pitts, the defendant's supervisor at the Delta Express, described the defendant as an above average employee and recalled that the defendant was very upset over the shootings, a "nervous wreck." He remembered that the defendant was unable to control his emotions and had "held his head down between his hands, and stood there and shook."

James Nichols, an agricultural education instructor at Richland High, testified at the Juvenile Transfer Hearing. He remembered seeing Rouse fire his

8

rifle toward Coach Shirey and grabbing the barrel of the rifle in an effort to take it away from Rouse. During the struggle, a shot was accidentally fired into the ceiling. When Nichols ordered Rouse to surrender the gun, Rouse responded, "I can't. I've went too far." Nichols and several others were able to take the gun from Rouse.

The defendant, who was seventeen years old when the shootings occurred, was a senior at the school and worked at Delta Express. He had planned to enlist in the Navy after school and had scored in the upper ten percent on the Armed Service Vocational Aptitude Battery Test. He testified that he had befriended Rouse in his sophomore year and had often heard Rouse threaten to kill people but had never before known him to carry out any of the threats or violence against anyone.

He recalled that on the evening before the shooting, Rouse, who was not on duty at the time, stopped by Delta Express to exchange a compact disc player. He remembered that Rouse had threatened to kill Tina Mueller and had sought his help. The defendant claimed that he responded, "I don't know" and then laughed because he did not think Rouse was serious. The defendant acknowledged telling Billy Rogers, "If there is a God, I hope it snows tomorrow." While conceding that he had said to Rogers that he was going to lose a couple of friends, he did not think anyone was going to get killed but only that some type of fight would occur.

He testified that on the morning of the shooting, Rouse had called to say that he would pick him up a little early. When he got in Rouse's truck, the defendant saw the gun and shells in the seat. He testified that he asked about the weapon and Rouse responded, "It's going to happen today." Along the way, Rouse

9

stopped to purchase a drink and a candy bar and then drove to Steve Ray's home. Ray came to the truck and asked about the weapon; Rouse responded it was for "Hobbs, and whoever gets in the way." The defendant testified that he agreed with Ray, who said, "You're crazy."

The defendant testified that he then agreed to Rouse's request that he drive. He described the request as not unusual because he had driven the truck several times previously. He explained that he agreed to drive because he had not driven in a while, as his own truck was "broke down." The defendant recalled that Rouse placed the weapon in his lap and said, "now he can shoot the cop in front of the school." The defendant explained that he thought Rouse was joking, but conceded that he was a little worried about Rouse's behavior. He testified that when he parked the truck, Rouse got out fast and walked toward the school without waiting. The defendant yelled three or four times at Rouse, who did not respond. The defendant, who had no recollection of Rouse loading the rifle, recalled that Rouse fired at Ms. Foster and Ms. Yancy and continued to walk down the hall. The defendant, who insisted he did not help plan the shootings and had no intent to harm anybody, stated that he left the school grounds with Ray.

Perry Gammons testified for the state in rebuttal. He claimed that the morning of the shootings, he had seen the defendant and Rouse talk near the front of Rouse's truck and then walk side by side toward the school.

(1)

The defendant first argues the evidence is insufficient to support the verdicts of guilty for all four offenses. He argues the state's case is based on "speculation and conjecture."

10

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); Tenn. R. App. P. 13(e).

The defendant may be found criminally responsible for Rouse's conduct if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, [he] solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2).

"[I]t is evident that Tenn. Code Ann. § 39-11-402(2) ... is derived from common law." State v. Carson, 950 S.W.2d 951, 954 (Tenn. 1997). Even under the theory of criminal responsibility for the acts of another, mere presence during the commission of the crime is not enough to convict. See Flippen v. State, 365 S.W.2d 895, 899 (Tenn. 1963); Anglin v. State, 553 S.W.2d 616, 619 (Tenn. Crim. App. 1977). Presence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred. No particular act need be shown. It is not necessary for one to take a physical part in the crime. Mere encouragement of the principal is sufficient. State v. McBee, 644 S.W.2d 428 (Tenn. Crim. App. 1982).

11

While the defendant "'must knowingly, voluntarily, and with common intent unite with the principal offenders in the commission of the crime,'" the "'common purpose need not be to commit the particular crime which is committed.'" Carson, 950 S.W.2d at 954 (quoting State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)). In Carson, our supreme court reaffirmed the "natural and probable consequences" rule:

> "[I]f two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal, if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose, or as a natural or probable consequence thereof."

950 S.W.2d at 954 (quoting Key v. State, 563 S.W.2d 184, 186 (Tenn. 1978)) (emphasis in original).

Under these guidelines, we must conclude, despite the closeness of the factual issue, that the evidence is sufficient to support all of the defendant's convictions. At the time of the offenses, second degree murder was defined as a "knowing killing of another." Tenn. Code Ann. § 39-13-210(a). Our code defines "knowing" as follows:

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-302(b).

First degree murder is defined as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). "'Premeditation' is an act done after the exercise of reflection and judgment" and requires that the "intent to

kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-11-302(d).

> Criminal attempt is defined as follows:
>
> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
> (b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.
> (c) It is no defense to prosecution for criminal attempt that the offense attempted was actually committed.

Tenn. Code Ann. § 39-12-101.

With the view that the verdict accredited the witnesses for the state and in the light most favorable to the position of the state, the evidence is adequate to support the verdict of second degree murder. On appeal of the guilty verdict, the presumption is one of guilt rather than one of innocence. The night before the shootings, the defendant and Rouse discussed going to school and killing an officer, a student with whom Rouse had had a verbal altercation, a teacher, and a principal. When Rouse asked the defendant if he wanted to help, the defendant responded, "Yeah." On the next day, the defendant drove Rouse to the school. He admitted seeing the murder weapon and ammunition in the truck. There was some evidence the defendant walked with Rouse into the school before Rouse shot and killed Ms. Foster and Ms. Collins and severely injured Ms. Yancy. By doing so, Rouse committed two murders and an attempt to murder. By aiming his weapon and firing

13

at Shirey, a teacher Rouse advised the defendant that he would kill, Rouse committed attempted first degree murder.

That Rouse and the defendant did not specifically plan or discuss their intended crimes against the particular victims does not serve to excuse or mitigate guilt. Under the ruling in Carson, the defendant is liable for all crimes which are the natural and foreseeable consequences of the plan. That persons at the school other than those specifically discussed would be injured or killed during this plan is, in our view, reasonably foreseeable. Carson, 950 S.W.2d at 955.

(2)

In a related argument, the defendant claims that the trial court erred by refusing to grant his motion for judgment of acquittal. Rule 29, Tenn. R. Crim. P., empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the state rests or at the conclusion of all the evidence. Overturf v. State, 571 S.W.2d 837 (Tenn. 1978). At the point the motion is made, the trial court must favor the opponent of the motion with the strongest legitimate view of the evidence, including all reasonable inferences, and discard any countervailing evidence. Hill v. State, 470 S.W.2d 853 (Tenn. Crim. App. 1971).

The standard by which the trial court determines a motion for judgment of acquittal at that time is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction. That is, "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307

14

(1979).  We have previously concluded the evidence is sufficient to support the convictions; accordingly, this issue is without merit.

(3)

The next issue is whether the indictment sufficiently charges each offense.   The defendant argues that the count charging first degree premeditated murder fails to allege the element of "deliberate"; the count charging felony murder, for which the defendant was convicted of second degree murder, fails to allege the element of "reckless" as well as "deliberate" with respect to the underlying felony; and the counts charging attempted first degree murder fail to allege "deliberate."

Generally, an indictment must set forth the elements of the offense. State v. Perkinson, 867 S.W.2d 1, 5 (Tenn. Crim. App. 1992).  It is settled law that "[w]hen the indictment or presentment fails to fully state the crime, all subsequent proceedings are void." Id. (citing State v. Morgan, 598 S.W.2d 796, 797 (Tenn. Crim. App. 1979)).

Provisions of the state and federal constitutions guarantee the criminally accused knowledge of "the nature and cause of the accusation."  U.S. Const. amend. VI; Tenn. Const. art I, § 9.  "Fair and reasonable notice of the charges against an accused is a fundamental constitutional requirement." State v. Trusty, 919 S.W.2d 305, 309 (Tenn. 1996).  To be sufficient, an indictment must "inform the defendant of the precise charges; ... must enable the trial court upon conviction to enter an appropriate judgment; ... and must protect [the] defendant against double jeopardy." Id.  As a matter of fairness, the constitutional requirement is designed to afford the criminally accused with an adequate opportunity to prepare any defense before the trial. See, e.g., Pope v. State, 258 S.W. 775 (Tenn. 1924);

15

Daniel v. State, 50 Tenn. 257 (1871).

In Perkinson, our court explained the rationale for requiring the indictment to charge the essential elements of the offense:

> To allow a prosecutor or court to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection that the grand jury was designed to secure, because a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury that indicted him.

867 S.W.2d at 5 (quoting United State v. Cecil, 608 F.2d 1294, 1297 (9th Cir. 1979)).

In our view, the indictments are sufficient. Count one alleges as follows:

> [the defendant] did unlawfully commit First Degree Murder by being criminally responsible for ... the conduct of James Ellison Rouse ... in that the [defendant] acting with intent to promote or assist the commission of said offense, or to benefit in the proceeds or results of said offense, did intentionally, knowingly, wilfully and unlawfully solicit, direct, aid or attempt to aid the said James Ellison Rouse to unlawfully, knowingly, intentionally and with premeditation kill Carolyn Foster with a .22 rifle ....

At the time the offense was committed, in November 1995, first degree murder was defined as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202. It is unnecessary that the indictment allege the killing was deliberate. See State v. Michael K. Christian, No. 03C01-9609-CR-00336, slip op. at 10 (Tenn. Crim. App., at Knoxville, Mar. 23, 1998), app. filed, May 26, 1998.

Count two alleges as follows:

> [The defendant did aid and abet Rouse] to unlawfully and knowingly kill Dianne Collins with a .22 rifle, in attempting to perpetrate First Degree Murder, to-wit: while [Rouse]

16

did unlawfully, knowingly, intentionally and with premeditation attempt to kill Ron Shirey.

The defendant complains that the indictment should have alleged the killing of Ms. Collins was reckless and that the attempted first degree murder of Shirey was done deliberately. At the time of the offense, our law defined felony murder as a "killing of another committed in the perpetration of or attempt to perpetrate any first degree murder ...." Tenn. Code Ann. § 39-13-202(a)(2). "No culpable mental state is required for conviction under subdivision (a)(2)." Id. Accordingly, there is no requirement that the indictment allege the killing was reckless. Also, as noted previously, a premeditated first degree murder does not require a deliberate killing.

Counts three and four charge the defendant with aiding and abetting Rouse "to unlawfully, knowingly, intentionally and with premeditation attempt to kill [the victim]." The defendant complains the counts should have alleged the attempted murders were deliberate. At the time the offenses were committed, however, deliberation was not a requisite element and, in consequence, did not need to be alleged. Christian, slip op. at 10.

(4)

Next, the defendant claims that the juvenile court erred by transferring him to circuit court to be tried as an adult. He argues that he had the ability and predisposition to benefit from rehabilitation and did not require such a transfer.

Much of the proof at the transfer hearing mirrored the proof at trial. The night before the shootings, the defendant and Rouse abruptly ended a private discussion when co-worker Rachel Warren approached them. The defendant told Rouse they would discuss the matter later. The defendant told the police that Rouse had discussed shooting Tina Mueller, a student, Shirey, a teacher, and

17

Principal Hobbs. When asked if he wanted to help, the defendant responded in the affirmative. On the day before the shootings, the defendant informed Billy Rogers that he was about to lose a couple of friends. The defendant drove the truck to school.

The defendant presented several witnesses on his behalf. Dr. Kenneth Anchor, a clinical psychologist, testified that he examined the defendant and found he "did not demonstrate the typical juvenile delinquent or juvenile offender profile." Dr. Anchor's overall interpretation of various psychological tests was as follows:

> This is a young man who is not confident. He does not enjoy good self-esteem. He has a great deal of problems living; problems in relationships. ... And the bottom line, here is this is somebody who is very much in need of mental health resources or services.

It was Dr. Anchor's opinion that the defendant would benefit greatly from treatment: "I believe he has sufficient intellect to benefit from it. I believe he would be cooperative and motivated ... to restore himself ... I think the prognosis is favorable."

The defendant's mother, Donna Abbott, testified that her son had never caused the family any difficulties, always having helped with household chores. She testified that he also helped financially, having worked the past one and one-half years. Because the defendant's father was disabled, the family relied, in part, on the defendant's income. Ms. Abbott described her son as active in school.

The defendant's father, Don Abbott, testified that the defendant had been working with him and another son to start a pallet recycling business. He

stated that he and his sons had begun construction of a building, collected pallets, and had purchased a truck and office equipment. He described the defendant as having a strong interest and ability in mechanics and electronics.

Morris Mitchell, a counselor at Richland High School, testified that the defendant scored well above average on various proficiency tests and college admission tests. He stated that the defendant also scored well on the Armed Service Vocational Aptitude Battery.

Section 37-1-134, Tenn. Code Ann., provides for a transfer from juvenile court to circuit court under the following circumstances:

> The disposition of the child shall be as if the child were an adult if:
>
> ***
>
> (4) The court finds that there are reasonable grounds to believe that:
>
> (A) The child committed the delinquent act as alleged;
> (B) The child is not committable to an institution for the mentally retarded or mentally ill; and
> (C) The interests of the community require that the child be put under legal restraint or discipline.
>
> (b) In making the determination required by subsection (a), the court shall consider, among other matters:
>
> (1) The extent and nature of the child's prior delinquency records;
> (2) The nature of past treatment efforts and the nature of the child's response thereto;
> (3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
> (4) Whether the offense was committed in an aggressive and premeditated manner; and
> (5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state.

19

In ordering the transfer to circuit court, the judge ruled from the bench as follows:

> There is an area here concerning Mr. Abbott that needs looking into by a jury of his peers. I've listened as open-mindedly as I can, with his young man's whole problem in mind. But I think that there is enough involvement here that it should be dealt with in a different setting.
>
> There certainly was time to reflect, and to do other things, than what transpired this morning of this tragic event. And all of the activities, leading up to it that's been testified to by these other witnesses, leave me with a real bad feeling about this situation involving this young man; that he had the opportunity to have disengaged himself from this entire scenario, but he didn't do it.
>
> So I'm going to transfer him, also.

About a week later, the court entered a written order ruling as follows:

> The juvenile concerned, Stephen John Abbott, has been charged with crimes involving the loss of human life, and the Court has found that there are reasonable grounds to believe that he committed these acts. The evidence shows that the acts were committed in an aggressive and premeditated manner. The juvenile is 17 years of age, and he will be 18 in a few weeks. As this Court has means of dealing with a child only up to his nineteenth birthday, the possibility of rehabilitation in a case of this seriousness is not good.

At the time of the transfer, there were reasonable grounds to believe the defendant had committed the alleged acts. See Tenn. Code Ann. § 37-1-134(4). The state presented proof which would allow the trial judge to conclude the defendant discussed the shootings with Rouse the night before and then drove the truck to the school the next day to execute the plan. There is also a reasonable basis to believe the defendant is not committable to an institution for the mentally retarded or mentally ill. Id. Finally, given the gravity of the offenses, there is a reasonable basis for concluding the defendant needed to be "put under legal restraint." Id.

20

That the defendant did not have a prior criminal background weighs in his favor. The offenses involved, however, were "against the person" and were "committed in an aggressive and premeditated manner." Id. While the defendant offered persuasive evidence that the acts were out of character and that he could benefit from psychological treatment, the transfer, in our view, was appropriate.

(5)

The defendant also claims the juvenile court erred in consolidating his transfer hearing with that of his co-defendant Rouse. He asserts that the "very nature of a transfer hearing [requires] individual attention" and complains that the consolidation of his transfer hearing with Rouse violated due process principles. The state argues that the defendant has failed to show prejudice by virtue of consolidation of the cases.

We agree with the state. The defendant has not explained how his due process rights have been violated, other than the complaint that he has not received individualized treatment. Yet the record does not support his claim that he was deprived of individual attention. The orders indicate consideration of the circumstances of each juvenile. Both were afforded the opportunity to cross-examine the state's witnesses and to put on their own evidence. Rule 1(d), Tenn. R. Juv. P., provides that where "no specific procedure is prescribed by the rules, the court may proceed in any lawful manner, in accordance with written local rules of court, which shall not be inconsistent with these rules or with any other applicable law." Obviously the trial judge complied with the statutory requirement that the defendant be afforded a hearing to determine the appropriateness of the transfer. See Tenn. Code Ann. § 37-1-134. A consolidation, when the crimes and the facts and circumstances arise out of the same incident, is not "inconsistent" with the

21

statute.

(6)

The defendant also claims the trial court erred by overruling his motion to suppress a statement he gave while in custody because he had not been advised of his <u>Miranda</u> rights. On the date of the shootings, the defendant provided two signed statements which were admitted into evidence through the testimony of Officer Chapman; neither has been challenged in this appeal. The following day, Officer Chapman asked the defendant if he knew about Rouse's plan to shoot the officer who directed traffic in the front of the school. The defendant responded that he learned about the plan only after he undertook to drive the truck to school. Based on this response, Officer Chapman provided <u>Miranda</u> warnings and turned on the tape recorder. The defendant then gave a fourth lengthy statement. The trial court suppressed the fourth statement because the defendant requested an attorney after the warning was given but officers continued to take the statement. The statement at issue is the third statement the defendant made before any <u>Miranda</u> warnings were given.

Officer Chapman testified that after the shootings, he learned from other sources that the defendant drove the truck to the school and that there had been a plan to shoot the officer who worked in front of the school. The day after the shootings, he called the defendant's mother and told her he had "two questions" he wanted to ask. When the defendant's parents brought him to the station, Officer Chapman did not give any <u>Miranda</u> warnings. Instead, explained that he wanted to talk about two issues: first, whether there was a plan to shoot the police officer that works in front of the school; and, second, whether the defendant was driving. The defendant responded by saying he did not learn about the plan to shoot the officer

22

until after he took the steering wheel of Rouse's truck. It was at this point that the officer turned on the tape recorder and gave <u>Miranda</u> warnings.

The officer insisted that the defendant was not in custody at that time, was not under any restraint, and had been brought to the station by his parents on a voluntary basis. When asked whether the officer intended to let the defendant leave, the officer answered, "After these statements were completed, I had to call the District Attorney's office to see where we were as far as any kind of charges. That took some time. It was my intention that they be allowed to go.... The Sheriff overruled that." When asked whether he told the defendant and his parents they were free to leave, the officer responded, "Yes. I told them they could go. They wanted to stay until they heard the results of what the District Attorney's office decided, as to whether there would be any criminal charges or not."

The trial court denied the motion to suppress, ruling as follows:

> To take <u>Miranda</u> to the extreme, everybody who was interrogated would have to be mirandized.
> The question -- and it is a thin-line question, here -- is whether or not Mr. Abbott had become the focus of the investigation. ...
> At what point did he independently become the focus of a criminal investigation involving him? That is the question that has to be answered in order to make a determination of whether statement number three, ... which is the oral statement immediately preceding the taped statement, is to be suppressed.
> I do not think the evidence justifies suppression of the statement made at that time. ...
> The motion to suppress the oral statement will be denied.

In <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966), the United States Supreme Court ruled that prior to custodial interrogation, the police must inform the individual being questioned that he has the right to remain silent, that any

23

statements made may be used against him, that he has the right to an attorney, and that if he can not afford an attorney, one will be appointed for him prior to questioning.  "Custodial interrogation" was defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  Id.

Because warnings were not given prior to the statements, the crucial issue is whether the defendant was "in custody."  In State v. Anderson, 937 S.W.2d 851, 851-52 (Tenn. 1996), our supreme court "clarif[ied] standards by which courts determine whether a person being questioned by law enforcement officers is 'in custody,' and therefore entitled to" Miranda warnings.  The court acknowledged that in State v. Morris, 456 S.W.2d 840 (Tenn. 1970), it held that the focus of the investigation test was the appropriate standard.  Anderson, 937 S.W.2d at 853.  Our supreme court ruled, however, that the holding in Morris was inconsistent with several opinions by the United States Supreme Court and determined that the "focus or progress of the investigation is not relevant to determine whether a person is in custody."  Id.  Instead, the court set forth the following rule: "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest."  Id. at 855.

Several factors are relevant in determining whether the suspect is in custody:

(1)  the time and location of the interrogation;

(2)  the duration and character of the questioning;

(3)  the officer's tone of voice and general demeanor;

(4)  the suspect's method of transportation to the place of questioning;

24

(5) the number of police officers present;

(6) any limitation on movement or other forms of restraint imposed on the suspect during the interrogation;

(7) any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal and nonverbal responses;

(8) the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt;

(9) and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Id. at 855.

Generally, a trial court's findings of fact at a motion to suppress are binding on appeal unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 22 (Tenn. 1996). In this instance, however, the trial court's finding and ruling focused on whether the investigation had moved to the accusatory stage; the trial court did not address whether, "under the circumstances, a reasonable person" would have "considered himself ... deprived of freedom of movement to a degree associated with a formal arrest." Anderson, 937 S.W.2d at 855. Because Anderson was filed several months after the suppression hearing in this case, the trial court did not have the benefit of the opinion at the time of the ruling. For a different reason than that articulated by the trial court, we conclude the defendant was not in custody and thus not entitled to Miranda warnings.

The questioning occurred at the police station, but was brief. There is no indication that the method of inquiry was overly confrontational. There is no proof as to the officer's tone of voice or his general demeanor. The defendant and his parents voluntarily traveled to the station. There were few officers present, no

25

restraint on the defendant's movement during questioning, and, most significantly, the defendant and his parents were informed that they were free to leave. The defendant's parents chose to stay to learn whether the District Attorney's office intended to prosecute. In our assessment, the trial court did not err by overruling the motion to suppress.

(7)

The defendant argues the trial court erred by refusing to strike certain prospective jurors for cause. He specifically complains about prospective jurors Thomas Gatlin, Lisa Edwards, and William Davis.

The defendant complains that prospective juror Thomas Gatlin should have been excused for cause because he indicated he would like to see the defendant testify. Gatlin indicated that he had heard about the case and "had an opinion." The trial court asked if he could "overcome that opinion and follow the charge of the judge and follow the evidence in the case." Gatlin responded affirmatively. Defense counsel asked if it would be necessary for the defendant to testify in order for him "to decide this case." Gatlin responded, "After hearing what they say, yes, I would have to hear it"; but he also indicated that if the defendant did not testify, he would not hold it "against him." When defense counsel moved to strike Gatlin for cause, the trial court responded as follows:

> Counsel, you are assuming that the prospective juror knows the law in phrasing the question that way. A defendant does not have to testify, as a matter of law. He has a perfectly valid right not to testify, and the Court will instruct you in the law that if he does choose not to testify, neither the Judge nor the jury can draw any inference against him simply because he did not testify. Now, that is not a matter of fact. That is ... a matter of law, which the court will charge to you at the end of the case. Challenge for cause is denied.

The defendant used a peremptory challenge to remove Gatlin from the jury.

26

The defendant also complains about prospective juror Lisa Edwards. When defense counsel asked if any of the prospective jurors thought the defendant was "probably guilty of something, or he wouldn't be sitting [there]," Ms. Edwards responded affirmatively. Ms. Edwards explained that she based that opinion on what she had heard and read in the media. Ms. Edwards related that she "[thought] he was involved in it." The defendant moved to strike Ms. Edwards for cause.

The trial court asked Ms. Edwards if she could "set that [the news media] aside and try this lawsuit on the real evidence in the case?" Ms. Edwards responded that she could and the she realized the defendant "is innocent until the state proves him guilty." No further attempt was made by the defendant to challenge Ms. Edwards for cause, although he later used a peremptory challenge to remove her from the jury.

The defendant also complains about prospective alternate juror William Davis, who attended the same church as Assistant District Attorney General Sanders and had known Sanders for four or five years. They are on a first-name basis and had served on a governing body of the church together. They have never visited each other in their homes. Davis asserted that the relationship would not affect his decision as a juror and that if he had a reasonable doubt about the defendant's guilt, he would find him innocent. After the trial court denied his motion to challenge for cause, the defendant used a peremptory challenge to remove Davis.

Prior to the jury being finally selected, the defendant, who had used all of his peremptory challenges, again objected to the court's refusal to remove Gatlin, Edwards, and Davis for cause. He also represented to the trial judge that if he had

27

not used his peremptory challenges on those three prospective jurors, he would have used them on juror Marilyn Roderick and juror Donnie McNealy, who were in the first group of prospective jurors to be seated. Brief questioning of McNealy revealed that he worked at Union Carbide and has two teenage children. He had heard abut the shootings through the media. The record shows that no questions were submitted to Ms. Roderick.

Article I, section 9 of the Tennessee Constitution assures the accused in a criminal prosecution "the right, among other rights, to a speedy public trial ... [by] an impartial jury." "[T]he challenge for cause was designed to exclude from the jury triers whose bias or prejudice rendered them unfit...." Manning v. State, 292 S.W. 451, 455 (Tenn. 1927). "The qualification of a juror is within the trial judge's discretion and his finding a juror to be qualified will not be disturbed on review except on the clear showing of an abuse of discretion." Burns v. State, 591 S.W.2d 780, 782 (Tenn. Crim. App. 1979).

Rule 24, Tenn. R. Crim. P., provides in part:

Any party may challenge a prospective juror for cause if:

* * *

(2) The prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror. ... A prospective juror who states that he or she will be unable to overcome preconceptions shall be subject to challenge for cause no matter how slight the exposure. If the prospective juror has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his or her judgment will be affected, the prospective juror's acceptability shall depend on whether the testimony as to impartiality is believed. If the prospective juror admits to having formed an opinion, he or she shall be subject to challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial.

28

(Emphasis added).

While juror Gatlin initially indicated he would need to hear the defendant testify, he then asserted he would not hold it against the defendant if he did not testify. The state argues there was no error because the trial court rehabilitated the juror. Yet "[e]xtreme care should be taken in trying to rehabilitate a prospective juror into vocalizing impartiality." State v. Strouth, 620 S.W.2d 467, 471 (Tenn. 1981) (discussing with approval the Advisory Commission Comments to Rule 24, Tenn. R. Crim. P.). The Advisory Commission "disapproves of questions tending to lead the prospective juror or suggest partiality in the first instance, and also disapproves of that procedure in 'rehabilitating' the prospective juror into vocalizing impartiality." Advisory Commission Comments to Rule 24, Tenn. R. Crim. P.

The trial judge made a lengthy statement to the juror about the defendant's right not to testify and then concluded, "Now, that is not a matter of fact. That is ... a matter of law, which the Court will charge to you at the end of the case." In our view, the pronouncement by the trial court did not meet the guidelines established by the rule. This is especially so because no follow up questions occurred and the juror did not "unequivocal[ly]" assert he would not require the defendant to testify before finding reasonable doubt. Advisory Commission Comments to Rule 24, Tenn. R. Crim. P.

Gatlin's comments indicated that he could not find the defendant not guilty unless he testified. While the record establishes that he was not rehabilitated, the resolution of this issue "depends not so much on the trial court's ruling concerning [Gatlin] as it does upon the examination and qualifications of [Ms.

29

Roderick and McNealy], the juror[s] the defendant was 'forced' to accept." State v. Gray, 960 S.W.2d 598, 608 (Tenn. Crim. App. 1997). "[A]ny error in refusing to excuse [a juror] for cause ... does not entitle the defendant to a new trial unless the jury that ultimately heard the case was not fair and impartial." State v. Howell, 868 S.W.2d 238, 249 (Tenn. 1993) (citations omitted). Because the voir dire of Ms. Roderick and McNealy contains no hint of bias or prejudice, the defendant's complaint about the excused juror Gatlin is without merit.

The defendant complains about juror Edwards' exposure to pretrial publicity and her acknowledgment that she thought the defendant may have been involved in some way. She did, however, "unequivocally" assert she could follow the law and accept the proposition that the defendant was presumed innocent. "Jurors need not be totally ignorant of the facts of the case on which they sit [and even] the formation of an opinion on the merits will not disqualify a juror if [he] can lay aside [his] opinion and render a verdict based on the evidence presented in court." Howell, 868 S.W.2d at 249 (internal quotation marks omitted). The trial court did not err by refusing to remove Ms. Edwards for cause.

The defendant's complaint about prospective alternate juror Davis is also without merit. When the defendant used a peremptory strike to remove Davis, the replacement was Kerry Pennings. None of the three alternate jurors participated in the deliberations. The defendant is not entitled to a new trial unless he carries the heavy burden of demonstrating that "the jury that ultimately heard the case was not fair and impartial." Gray, 960 S.W.2d at 608.

(8)

The defendant also claims the trial court erred by refusing to grant his

30

motion for a change of venire. The defendant had filed a pretrial motion seeking either a change of venire or, alternatively, a change of venue. After a lengthy hearing, the trial court granted a change of venue from Giles County to Maury County. The defendant now complains that a change of venire should have been granted instead.

> Section 20-4-201, Tenn. Code Ann., governs change of venire:
>
> Cases in which venue changeable.--In all civil cases at law where the issue is to be tried by jury, and in all cases of issues in courts of equity directed to be tried by jury, either in the circuit or chancery court, in all civil cases before a judge of the court of general sessions, and in all criminal cases:
> (1) The venue may be changed, at any time before trial, upon good cause shown, as prescribed in this part; or
> (2) A court may issue an order for a special venire of jurors from another county if in its discretion it determines the action to be necessary to ensure a fair trial.

Tenn. Code Ann. § 20-4-201.

Prior to 1995, the statute only authorized a change of venire in civil cases. Effective May 30, 1995, however, the statute was amended to allow for a change of venire in criminal cases. In State v. Nichols, 877 S.W.2d 722 (Tenn. 1994), the defendant filed a motion for a change of venue. Rather than moving the situs of the trial, the trial court ordered that the jury be chosen from residents of a different county. Id. at 727. The defendant appealed, arguing that there was no authority for the procedure used by the trial judge. The supreme court found that the filing of the motion for a change of venue constituted a waiver of the right to have the jury drawn from the county where the indictment originated; in so doing, the court observed that a statute allowing for "summoning juries from another county" would "ensure uniformity and fairness across the state and avoid error from excessive experimentation." Id. at 729. The amendment was the legislative

31

response to the suggestion.

When there is excessive pretrial publicity, either a change of venire or a change of venue is an appropriate remedy. Id. The issue is discretionary for the trial court and will not be overturned unless there is an abuse of that discretion. See Tenn. Code Ann. § 20-4-201(1). Here, the trial judge sent questionnaires to every potential juror, allowed extensive voir dire, and excused several jurors who indicated they could not be impartial because of the pretrial publicity. He also excused potential jurors who knew the victims or had significant knowledge about the trauma the victims' families had suffered. This record does not indicate that the jury was unfair or biased.

(9)

The defendant next claims the trial court erred by allowing evidence that he and his co-defendant were wearing black clothing at the time the crime was committed. He argues that the evidence was irrelevant and unduly inflammatory and had a prejudicial effect on the trial.

Sheriff Eddie Bass testified that the defendant wore a black shirt, black pants, and black boots on the day of the shooting. There was also evidence that Rouse wore black on the day of the shootings. In closing, the state argued, "It's not enough to convict, ... but why are these buddies wearing black on this day?"

Admission of this evidence is governed by Tenn. R. Evid. 403, which provides as follows:

> Exclusion of Relevant Evidence on Grounds of Prejudice,
> Confusion, or Waste of Time. Although relevant,
> evidence may be excluded if its probative value is
> substantially outweighed by the danger of unfair

32

> prejudice, confusion of the issues, or misleading the jury,
> or by considerations of undue delay, waste of time, or
> needless presentation of cumulative evidence.

The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly ... an emotional one." State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Advisory Committee Note to Fed. R. Evid. 403). One authority characterizes evidence that is unfairly prejudicial as that designed to appeal to the sympathy, sense of horror, or instinct to punish. J. Weinstein and M. Burger, Weinstein's Evidence Manual 6-20 to 6-21 (Student ed. 1987).

Whether to admit evidence under Rule 403 is within the discretionary authority of the trial court and will not be reversed absent a clear showing of an abuse. State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

In our view, the trial court did not err by allowing the testimony. The defendant's theory at trial was that he had no idea Rouse was actually going to shoot the victims. That the defendant and Rouse were dressed similarly or wore the same color of clothing on the day of the shootings lends support to the state's theory that the two acted in concert. Accordingly, the evidence had some "probative value." Tenn. R. Evid. 403. Because the testimony about the defendant's clothing was brief and not overly emphasized in the context of the entire trial, the trial court properly admitted the evidence. It did not, therefore, qualify as "unfairly prejudicial." Tenn. R. Evid. 403.

(10)

The defendant argues the trial court erred by failing to charge the lesser offense of facilitation of a felony as to all counts. The defendant was indicted for two counts of first degree murder and two counts of attempted first degree murder. The offenses of second degree murder and voluntary manslaughter were charged as lesser offenses of first degree murder. Attempted second degree murder and attempted voluntary manslaughter were charged as lesser offenses of attempted first degree murder. Although all of the charges were based on the defendant's being criminally responsible for Rouse's conduct, facilitation of a felony was not charged.

The trial judge has a duty to give a complete charge of the law applicable to the facts of the case. State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). There is an obligation "to charge the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so." Tenn. Code Ann. § 40-18-110(a). "Pursuant to our statute, rule, and case law interpretations, defendants are entitled to jury instructions on all [lesser offenses], if the evidence would support a conviction for the offense." State v. Trusty, 919 S.W.2d 305, 311 (Tenn. 1996). Such a charge "allows the jury to consider all relevant offenses in determining the appropriate offense, if any, for conviction" and "more evenly balances the rights of the defendant and the prosecution and serves the interests of justice." Id. It is only when the record is devoid of evidence to support an inference of guilt of the lesser offense that the trial court is relieved of the responsibility to charge the lesser crime. State v. Stephenson, 878 S.W.2d 530, 549-50 (Tenn. 1994); State v. Boyd, 797 S.W.2d 589, 593 (Tenn. 1990).

In Trusty, 919 S.W.2d at 310, our supreme court ruled as follows:

> Tennessee law recognizes two types of lesser offenses that may be included in the offense charged in the indictment: offenses necessarily included in the indictment and offenses that are lesser grades of the charged offense. An offense is "necessarily included in the indictment ... only if the elements of the included offense are a subset of the elements of the charged offense and only if the greater offense cannot be committed without also committing the lesser offense."

Id.

Our supreme court also provided guidance on how to determine whether an offense is a lesser grade or class of the offense charged: "[o]ne need only look to the statutes to determine whether a given offense is a lesser grade or class of the crime charged." Id. at 310. By way of example, the court observed that the legislature has divided criminal homicide "into the grades of first-degree murder, second-degree murder, voluntary manslaughter, criminally negligent homicide, and vehicular homicide." Id.

Here, the defendant was found criminally responsible for Rouse's conduct. The controlling statute provides that "a person is criminally responsible for an offense committed by the conduct of another if: (2) [a]cting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). Facilitation of a felony occurs when a person "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under 39-11-402(2), ... knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403.

Facilitation is a lesser grade of criminal responsibility for the conduct of another. State v. Utley, 928 S.W.2d 448, 952 (Tenn. Crim. App. 1995). In Utley, this court ruled that facilitation should only be charged "where the facts could cause reasonable minds to conclude that the defendant lacked the intent to promote or assist in or benefit from the felony's commission." Utley, 928 S.W.2d at 452. In our view, there was sufficient evidence for "reasonable minds" to have concluded the defendant had facilitated the felonies and, at the same time, had lacked the "intent to promote or assist in or benefit from" their commission.

The defendant's statements to Rogers about there being no school on the day of the shootings and that Rogers might lose "a couple of friends" suggest the defendant knew something about Rouse's desire to shoot one or more persons at the school. That the defendant undertook the responsibility of driving Rouse's truck qualifies as "furnish[ing] substantial assistance." Tenn. Code Ann. § 39-11-403. Finally, the defendant's pretrial statements, while self-serving, and his behavior after the shootings were evidence in support of the defense theory, i.e., that he lacked the intent to promote, assist in, or benefit from the shootings.

The defendant claimed that the first time Rouse asked for his help, he provided an equivocal answer. He stated that on the second occasion Rouse asked for help, he responded, "Yeah," and laughed--implying that he did not take the question seriously. That the defendant responded "yeah" and laughed could mean he earnestly desired to assist in the crimes. It could be interpreted as a refusal to accept the request as seriously made. The jury must be given the option of determining which interpretation to attach. The first interpretation would support the convictions. The second would have supported an instruction on the lesser offense.

Of more significance is that several state witnesses testified to the defendant's demeanor immediately after the shootings. Ray testified that the defendant was on the "verge of tears, pale. Trembling, [j]ust general shock." Pitts, the defendant's supervisor at the Delta Express, described the defendant as visibly distraught over the shootings, "a nervous wreck, ... and [shaking]." As argued by the defense, this behavior lent some support to the claim that the defendant lacked the intent to promote or benefit from the felonies. One witness testified that after the first set of shootings, Rouse grinned. When Nichols tried to stop Rouse, Rouse resisted. Several individuals had to wrestle Rouse to the ground to stop him. That behavior contrasts significantly with the descriptions witnesses gave of the defendant. The proof suggests that Rouse originated the plan, armed himself, and collected the necessary ammunition entirely on his own. Rouse committed the crimes. Several witnesses testified that the defendant was not present when the shootings occurred.

Because there was some evidence, circumstantial and direct, that the defendant only facilitated the shootings, that lesser offense should have been charged to the jury. In our view, the failure to charge the lesser offenses qualifies as reversible error. In State v. Willie Williams, Jr., No. 03S01-9706-CR-00060, slip op. at 8-9 (Tenn., at Knoxville, Sept. 21, 1998) (for publication), our supreme court overruled several prior cases and, by a three to two majority, held that the right to instructions on lesser offenses is a statutory right, rather than one founded in the Tennessee Constitution[2] and that, in consequence, the error is subject to a harmless error analysis:

> Reversal is required if the error affirmatively appears to
> have affected the result of the trial on the merits, or in

---

[2]"[T]he jury shall have the right to determine the law and the facts, under the direction of the court, as in other criminal cases." Tenn. Const. Art. I § 19. See McGowan v. State, 17 Tenn. 184 (1836) and its progeny.

other words, reversal is required if the error more probably than not affected the judgment to the defendant's prejudice.

(citing Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b)),

The proof of the greater offense was not overwhelming. There was substantial, credible evidence that the defendant merely facilitated the shootings. During deliberations, the jury posed the following question for the trial court: "If we find the act to have been committed to have been first degree murder or attempted murder by Mr. Rouse, does that imply that we can only imply the same result for Mr. Abbott, if we find that he attempted to help or did help Mr. Rouse, or can Mr. Abbott be found for a lesser crime of second degree or voluntary manslaughter." From this, the jury very clearly considered the defendant's level of participation and culpability. It is also apparent that the jury considered making a distinction between the level of Rouse's culpability and that of the defendant. In our view, the failure to charge the lesser offenses affirmatively appears to have affected the verdict to the prejudice of the defendant.

The state contends that if the "proof establishes guilt of the greater offense and the defendant claims he was unaware of the principal actor's intentions, the defendant is not entitled to an instruction on facilitation," pointing out that the "defendant argued that he did not know Rouse intended to commit a crime and that he did not assist him." Yet some of the proof submitted by the state tended to support facilitation rather than the greater offense. Also, it is a well-established rule of law that the defendant's protestation of innocence at trial does not relieve the trial court of the duty to instruct on offenses which are lesser than the one the state charges, when they are genuinely raised by the evidence.

In Templeton v. State, 240 S.W. 789 (Tenn. 1922), our supreme court reversed a murder conviction for failure to charge manslaughter. The state argued the defendant was not prejudiced by the omission because "counsel insisted ... that he was not guilty of any offense at all while the state insisted he was guilty of murder, not manslaughter." Id. at 791. In reversing the conviction, our high court ruled that "it is [the court's] duty to tell the jury what the law is applicable to any phase whatever of offenses charged against a defendant. He cannot be excused from doing so upon the ground merely that the defendant insists he is not guilty of anything and the state that he is guilty of a higher offense." Id.

The state also points to several cases where this court has found no reversible error for failure to charge facilitation. See State v. Spadafina, 952 S.W.2d 444 (Tenn. Crim. App. 1996); Utley, 928 S.W.2d at 453; State v. Julius E. Parker, No. 02C01-9606-CR-00188 (Tenn. Crim. App., at Jackson, Apr. 23, 1997). In Spadafina, a panel of this court ruled that "[f]acilitation of first degree murder was not raised by the proof of the State or the defendant[;] ... [n]either the State's proof nor the defendant's proof raises sufficient evidence upon which reasonable minds could convict the defendant of facilitation of murder." 952 S.W.2d at 14. In Utley, this court found that "no evidence existed in this case to support a lesser included offense of facilitation of felony murder." 928 S.W.2d at 453. In Parker, the state showed the defendant initiated the robbery, furnished the murder weapon, benefited in the proceeds, and was present when the murder occurred. slip op. at 15. The defendant, however, denied any participation or planning in the robbery. Neither the state's proof nor the defendant's proof supported an inference of guilt of facilitation. The panel in Parker correctly concluded that the record was "devoid of any evidence permitting an inference of guilty of the lesser offense." Id., slip op. at 15. In this case, however, some of the state's proof supported an inference of facilitation of the

crimes. Clearly, Parker, Utley, and Spadafina do not serve as precedent for the state's claim. The failure to instruct on lesser offenses which were legitimately raised by the evidence presented does not qualify as harmless error in this case; the cause must be remanded for a new trial.


(11)

The defendant's final argument is that the trial court imposed an excessive sentence. He complains about the length of the individual sentences as well as their consecutive nature. The defendant was sentenced as follows:

| count 1 | second degree murder | twenty years |
|---------|----------------------|--------------|
| count 2 | second degree murder | twenty years |
| count 3 | attempted second degree murder | ten years |
| count 4 | attempted first degree murder | twenty years |

Counts one and two are to be served consecutively with release eligibility after service of eighty-five to one-hundred percent of the forty-year term.


When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597 (Tenn. 1994). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

At the time of these offenses, the presumptive sentence for a Class A felony was the midpoint in the range. Tenn. Code Ann. § 40-35-210(c). Should the trial court find mitigating and enhancement factors, it must start at the presumptive minimum in the range and enhance the sentence based upon any applicable enhancement factors, then reduce the sentence based upon any appropriate mitigating factors. Tenn. Code Ann. § 40-35-210(e). The weight given to each factor is within the trial court's discretion provided that the record supports its findings and it complies with the Sentencing Act. See Ashby, 823 S.W.2d at 169. The trial court, however, should make specific findings on the record which indicate its application of the sentencing principles. Tenn. Code Ann. §§ 40-35-209 and -210.

Dallas Foster, victim Foster's husband, testified that Ms. Foster had been a school teacher for about twenty-one years and was fifty-eight years old when she lost her life. Her death had been "extremely hard" on him and their children. Joyce Ramsey, Ms. Foster's sister, testified that she had a close relationship with her sister. Ron Shirey, the victim of the attempted first degree murder, testified that he would never forget the shootings.

41

Judy McKenna testified for the defendant that she was a family friend of the Abbott's. The defendant worked for a time with her husband at a truck stop and was never paid for his help. The defendant was trustworthy, polite, and a hard worker. E.N. Bentley testified that he was the manager at the Delta Express when the defendant worked there. He was an above average worker and always received a very positive rating on his performance appraisal.

Donna Abbott, the defendant's mother, testified that the defendant was in his senior year of high school when the shootings occurred. Because her husband is disabled, the family is on a limited income. The defendant helped "make ends meet" by contributing financially to the family. The defendant also helped out around the home. The defendant is very close to his brothers and they had all been working together to start a pallet business.

The defendant testified that he was sorry the shootings had occurred. He contended that if he had believed Rouse, he would have "stopped him somehow."

The testimony at the juvenile transfer hearing concerning the defendant's above average academic record and his potential for rehabilitation through psychological treatment was entered into evidence at the sentencing hearing.

The trial court applied the following enhancement factors:

(1) offense involved more than one victim (Tenn. Code Ann. § 40-35-114(3));

(2) personal injuries inflicted on the victims were great (not applied to the attempted first degree murder of Shirey) (Tenn. Code Ann. § 40-35-114(6));

42

(3) the defendant had no hesitation about committing a crime when the risk to human life was high (Tenn. Code Ann. § 40-35-114(10));

(4) the crime was committed under circumstances where the potential for bodily injury was great (Tenn. Code Ann. § 40-35-114(16)); and

(5) the offense was committed on school property (Tenn. Code Ann. § 40-35-114(17)).

The trial court refused to find any mitigating circumstances.

The trial court imposed twenty year sentences for the two second degree murders and the attempted first degree murder. All Class A felonies, the Range I sentence for those offenses is fifteen to twenty-five years. Thus, the trial court imposed the presumptive minimum sentence for each of those offenses. For the attempted second degree murder, a Class B felony, the Range I sentence is eight to twelve years. The trial court imposed the mid-range sentence of ten years.

Even though the trial court found several enhancement factors and declined to find any mitigating circumstances, it still imposed the presumptive minimum sentence for the three Class A felonies. It was within the trial court's discretion to find the several enhancement factors but afford them no weight, as the statute provides if "there [are] enhancement but no mitigating factors, ... the court may set the sentence above the minimum." Tenn. Code Ann. § 40-35-210(d) (emphasis added). The ten-year sentence for attempted second degree murder may be considered an enhanced sentence, as the presumptive minimum for that offense is eight years. Tenn. Code Ann. § 40-35-112.

The defendant complains about the trial court's finding the enhancement factors that the personal injuries inflicted upon the victims were great; that he had no hesitation about committing the crime when the risk to human life

43

was high; and that the crime was committed under circumstances where the potential for bodily injury was high.  Tenn. Code Ann. § 40-35-114 (6), (10), (16).

That the personal injuries were great could not enhance the second degree murder sentences; it is inherent in those offenses.  State v. Jones, 883 S.W.2d 597 (Tenn. 1994).  That enhancement factor could, however, be applied to the attempted second degree murder of the victim Yancy.  "Particularly great injuries are not essential to the commission of [attempted murder], but prove greater culpability."  State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995).  The trial court did not apply the factor to the sentence for the attempted first degree murder of Shirey.

That the defendant had no hesitation about committing a crime when the risk to human life was high and that the potential for bodily injury to a victim was great are both applicable.  It is true that this court has held that factor (10), no hesitation about committing the crime, should not apply when "the only person subject to being injured is the victim."  State v. Makoka, 885 S.W.2d 366, 373 (Tenn. Crim. App. 1994).  Factors (10) and (16), however, may be applied where "people other than the victim[s]" are present and "are subject to injury."  State v. Sims, 909 S.W.2d 46, 50 (Tenn. Crim. App. 1995).  Here, there were several other students and teachers in the vicinity of the shootings.  Application of these factors is appropriate to all of the shootings.

The defendant also complains the court erred by refusing to find certain mitigating factors.  The defendant had argued the applicability of the following:

(1)  he acted under strong provocation;

44

(2) he played a minor role;

(3) he lacked substantial judgment in committing the offenses due to his youth;

(4) he committed the crimes under such unusual circumstances that it is unlikely a sustained intent to violate the law motivated his conduct;

(5) he acted under the duress or domination of another person;

(6) he had no history of prior criminal conduct;

(7) the crimes were contrary to his character; and

(8) he is amenable to rehabilitation.

See Tenn. Code Ann. § 40-35-113 (2), (4), (6), (11), (12), and (13). The trial judge rejected all of these. The latter three mitigating factors were offered under Tenn. Code Ann. § 40-35-113(13), which allows consideration of any "factor consistent with the purposes of this chapter." The trial court found they were not mitigating circumstances.

In our view, the trial court correctly ruled that there is no proof that the defendant acted under strong provocation. We also agree there was no proof the defendant played a "minor role." If the defendant drove Rouse to school to assist in the shootings, that conduct would not qualify as a minor role. The trial court ruled that there was no proof that the defendant lacked substantial judgment due to his youth. While seventeen years of age, the defendant qualifies as youthful, but there was much positive testimony about his level of maturity and his degree of responsibility. There was no proof he lacked substantial judgment. We further agree that there was no proof that the defendant did not possess a sustained intent to violate the law. The crimes were discussed the night before. The next day they were executed. These facts suggest a sustained intent to violate the law. There was also no proof that the defendant acted under the duress or domination of

45

another person. While there was proof that Rouse developed the plan, there is no evidence he coerced the participation of the defendant.

In our view, the three nonstatutory mitigating circumstances are entitled to some weight. Balanced against the weight of the enhancement factors, however, the sentences imposed by the trial would remain unchanged. The sentences are appropriate, given the weight of the enhancement factors. The sentence for attempted second degree murder was enhanced by two years. In our view, however, the enhancement was warranted, if for no other reason, because the crime was committed on school property.

We now turn to the appropriateness of ordering two of the twenty-year sentences to be served consecutively for an effective forty-year term. Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). In that case our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in State v. Taylor, 739 S.W.2d 227 (Tenn. 1987), the court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution: "[C]onsecutive sentences should not routinely be imposed . . . and . . . the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved." Taylor, 739 S.W.2d at 230. The Sentencing Commission Comments adopted the cautionary language. Tenn. Code Ann. § 40-35-115. The 1989 Act is, in essence, the codification of the holdings in Gray and Taylor; consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the

46

following criteria[3] exist:

> (1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;

> (2) The defendant is an offender whose record of criminal activity is extensive;

> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

> (6) The defendant is sentenced for an offense committed while on probation;

> (7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).


In Gray, our supreme court ruled that before consecutive sentencing could be imposed upon the dangerous offender, as now defined by subsection (b)(4) in the statute, other conditions must be present: (a) that the crimes involved aggravating circumstances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to

---

[3]The first four criteria are found in Gray. A fifth category in Gray, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion. See Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments.

the severity of the offenses.

In <u>State v. Wilkerson</u>, 905 S.W.2d 933, 938 (Tenn. 1995), our high court reaffirmed those principles, holding that consecutive sentences cannot be required of the dangerous offender "unless the terms reasonably relate[] to the severity of the offenses committed and are necessary in order to protect the public (society) from further criminal acts by those persons who resort to aggravated criminal conduct." The <u>Wilkerson</u> decision, which modified somewhat the strict factual guidelines for consecutive sentencing adopted in <u>State v. Woods</u>, 814 S.W.2d 378, 380 (Tenn. Crim. App. 1991), described sentencing as a "human process that neither can nor should be reduced to a set of fixed and mechanical rules." <u>Wilkerson</u>, 905 S.W.2d at 938. The record must show that the sentencing principles and all relevant facts and circumstances were considered before the presumption of correctness applies.

The trial court found consecutive sentences were appropriate because the defendant was a dangerous offender. We agree. Assistance the defendant provided Rouse indicates a lack of regard for human life. The plan posed a grave danger, not only to the intended victims but also to all of the others at the school. In our view, an aggregate forty-year term would have not been excessive had the convictions been upheld. Because, however, the trial court must under our law instruct the jury on not only the crime charged but also all lesser offenses raised by the evidence, the convictions must be reversed. All possible alternatives must be provided in the instructions. The cause is, therefore, remanded for a new trial.

_____
Gary R. Wade, Presiding Judge

48

CONCUR:


_____
David G. Hayes, Judge


_____
Jerry L. Smith, Judge